Charlie PLOEGER Jr., Appellant,

v.

The STATE of Texas, Appellee.

No. 01–04–01147–CR.

Court of Appeals of Texas, Houston (1st Dist.).

Jan. 12, 2006.

of his retirement pay before he can receive his disability pay.

Stephen A. Doggett, Richmond, for appellant.

John Healey, Dist. Atty.–Fort Bend County, Richmond, Jeff Strange, Houston, for appellee.

Panel consists of Justices TAFT, KEYES, and HANKS.

## OPINION

TIM TAFT, Justice.

A jury convicted appellant, Charlie Ploeger Jr., of the class A misdemeanor offense of stalking.[1] *See* TEX. PEN.CODE ANN. § 42.072 (Vernon 2003). The trial court assessed his punishment at 365 days in jail, suspended his sentence, and placed him on probation (community supervision) for 24 months. We determine (1) whether the trial court erred in charging the jury on stalking; (2) whether the evidence was legally sufficient to support the stalking conviction; and (3) whether the stalking statute is unconstitutional on its face or as applied to appellant. We reverse the judgment and remand the cause.

## Background

Appellant, who was in his 60s, was a long-time member at the Jehovah's Witness Kingdom Hall in Stafford, Texas. The complainant, Sylvia Solis, who was in her 20s, had later begun attending meetings at the same Kingdom Hall. In March 2001, during a church meeting, appellant passed Solis notes asking her to have lunch with him; Solis declined by writing "no" upon appellant's notes and returning them to him. From that point forward, appellant began sending cards, letters, flowers, and gifts to Solis, mainly through her mother's business, and eventually daily. The letters and cards repeatedly referred to their being married or having children as a future certainty, despite the fact that Solis had never even spoken to appellant. Solis was "terrified" and "frightened to death" by appellant's actions. Appellant also repeatedly sat near

or stared at Solis at church, often drove through the church parking lot even after the elders there had asked him to leave because of his behavior toward Solis, at least once waited for her at a nearby parking lot outside the Kingdom Hall property, once left gifts for her on a friend's car that looked like hers, and visited her mother's store, despite the fact that a police officer and church elder had told appellant either that Solis was terrified by his actions toward her or that his advances were unwelcome and should be stopped. Appellant's actions continued even after he had been arrested for stalking Solis.

## Jury–Charge Error

In issue four, appellant argues that the trial court erred in instructing the jury on the law of stalking. Specifically, appellant complains that the application paragraphs erroneously set out as *different acts,* each of which could independently constitute the offense of stalking, what should have been charged as *necessary elements* of the single offense of stalking. Appellant argues that these elements should have been charged conjunctively (as required for all necessary elements of one offense), rather than disjunctively (as allowed for different acts each of which constitutes a separate offense). Appellant further reasons that this disjunctive charge improperly allowed him to be convicted by non-unanimous verdict. The trial court overruled appellant's many objections on these grounds.[2] The State concedes reversible error.

---

1. The current version of the stalking statute makes the offense a felony, but that version does not apply to appellant, who committed at least some of the acts for which he was prosecuted before this amendment. *See* Act of, 2001, 77th Leg., R.S., ch. 1222, § 2, 2001 Tex. Gen. Laws 2795, 2795, 2796.

2. Appellant also moved pretrial to quash the indictment on the same grounds; although the trial court denied the motion, appellant does not complain of that ruling on appeal.

## A. Error

We agree with both parties that the charge was erroneous and requires reversal.

We start our analysis with the information, which read in pertinent part:

[Appellant] ... did then and there on or about March 1, 2001 and continuing until on or about May 14, 2002, in the County of Fort Bend and State of Texas, did then and there [sic]: on more than one occasion and pursuant to a common scheme or course of conduct directed specifically at Sylvia Solis, knowingly engaged [sic] in conduct that the defendant believed or should have reasonably believed that Sylvia Solis would regard as threatening bodily injury or death to Sylvia Solis namely, by following Sylvia Solis and sending Sylvia Solis mail and gifts[.]

It is further presented that [appellant] ... heretofore on or about March 1, 2001 and continuing until on or about May 14, 2002, in the County of Fort Bend and the State of Texas, did then and there: on more than one occasion and pursuant to a common scheme or course of conduct directed specifically at Sylvia Solis, knowingly engaged [sic] in conduct that would cause a reasonable person to fear bodily injury or death to herself namely, by following Sylvia Solis and sending Sylvia Solis mail and gifts[.]

Although the charge's instructions set out the stalking statute in its entirety, its application paragraphs tracked the information:

### III.

Now if you find from the evidence beyond a reasonable doubt that on or about March 1, 2001 and continuing until on or about May 14, 2002 in Fort Bend County, Texas, [appellant] did then and there, on more than one occasion and pursuant to a common scheme or course of conduct directed specifically at Sylvia Solis, knowingly engaged [sic] in conduct that the defendant believed or should have reasonably believed that Sylvia Solis would have regarded as threatening bodily injury or death to Sylvia Solis namely, by following Sylvia Solis or [sic] sending Sylvia Solis mail or gifts. [sic]

Unless you do so find beyond a reasonable doubt, or if you have a reasonable doubt thereof, you should read forward and consider the next paragraph.

Now if you find from the evidence beyond a reasonable doubt that on or about March 1, 2001 and continuing until on or about May 14, 2002 in Fort Bend County, Texas, [appellant] did then and there, on more than one occasion and pursuant to a common scheme or course of conduct directed specifically at Sylvia Solis, knowingly engaged [sic] in conduct that placed Sylvia Solis in fear of bodily injury or death and that would cause a reasonable person to fear bodily injury or death namely, by following Sylvia Solis or [sic] sending Sylvia Solis mail or gifts. [sic]

Unless you find and believe beyond a reasonable doubt that the defendant is guilty under the instructions of either of the two paragraphs in this numbered paragraph III, then you will find the defendant not guilty of stalking as charged in the information; or if you have a reasonable doubt as to whether he is guilty under either of such instructions, you will find him not guilty of stalking.

The stalking statute, in contrast to the language of both the information and the charge's application paragraphs, provided in pertinent part as follows:

§ 42.072. Stalking

(a) A person commits an offense if the person, on more than one occasion and pursuant to the same scheme or course

of conduct that is directed specifically at another person, knowingly engages in conduct, including following the other person, that:

(1) the actor knows or reasonably believes the other person will regard as threatening:

(A) bodily injury or death for the other person;

. . .

(2) causes the other person . . . to be placed in fear of bodily injury or death . . .; *and*

(3) would cause a reasonable person to fear:

(A) bodily injury or death for himself or herself;

. . . .

TEX. PEN.CODE ANN. § 42.072 (emphasis added). As the reporter's record reveals, the charge's application paragraphs were adopted under the assumption that section 42.072(a)'s sub-paragraph (1) established one act that constituted the offense of stalking, while sub-paragraphs (2) and (3) together established another act constituting the offense of stalking. Appellant (both in the trial court and here) and the State (here, though not in the trial court) argue that the three sub-paragraphs of section 42.072(a) each constitute an element of the single offense of stalking.

We agree with the parties' position on appeal that sub-paragraphs (1), (2), and (3) of section 42.072(a) are each elements of a single offense. This assumption is supported by the statute's grammatical structure and by the circumstances under which the current statute was adopted. The stalking statute's grammatical structure is as follows:

a person commits an offense by knowingly engaging in certain conduct that [subordinate clause]; [subordinate clause]; *and* [subordinate clause].

The use of semi-colons to divide the three clauses, the use of the conjunction "and"

between the last two clauses, the three clauses' modifying the same noun ("conduct"), and the clauses' having parallel numbering all show that the three clauses are equal elements that together define one offense. In contrast, if the Legislature had intended for the statute to have the meaning adopted in the trial court's charge, it would have structured the statute as follows:

a person commits an offense by knowingly engaging in certain conduct that [subordinate clause] *or* [subordinate clause] *and* [subordinate clause].

That structure simply cannot be read into the plain language of this statute.

More importantly, however, the current statute must be read with an eye toward the circumstances under which it was adopted, a major part of which was the Court of Criminal Appeals's interpretation of the stalking statute's predecessors. *See Long v. State,* 931 S.W.2d 285 (Tex.Crim. App.1996). Section 42.072's 1993 predecessor provided as follows:

A person commits an offense if, with intent to harass, annoy, alarm, abuse, torment, or embarrass another, he . . . on more than one occasion engages in conduct directed specifically toward the other person, including following that person, that is reasonably likely to harass, annoy, alarm, abuse, torment, or embarrass that person; [and] on at least one of those occasions by acts or words threatens to inflict bodily injury on that person or to commit an offense against that person. . . .

Act of Mar. 10, 1993, 73rd Leg., R.S., ch. 10, § 1,1993 Tex. Gen. Laws 46, 47, *amended by* Act of May 19, 1995, 74th Leg., R.S., ch. 657, § 2, 1995 Tex. Gen. Laws 3625, 3626, *repealed & renumbered by* Act of Jan. 27, 1997, 75th Leg., R.S., ch. 1, § 10, 1997 Tex. Gen. Laws 1, 3 (current version at TEX. PEN.CODE ANN. § 42.072(a)).

The *Long* court held that the above predecessor statute was unconstitutionally vague on its face because, among other things, (1) the terms "annoy" and "alarm," which another court had already held to be unconstitutionally vague, were now joined disjunctively with terms like "harass," "abuse," "torment," and "embarrass"; (2) the prohibited conduct included any conduct that could cause the resultant emotions; (3) no reasonable-person standard existed in the statute; (4) although at least two instances of conduct had to have occurred, only one of those needed to have threatened bodily injury or death, and the predicate acts did not need to relate to each other in any fashion; and (5) the First Amendment did not allow an offense to be created by adding unrelated, protected activity to a criminal act. *Long*, 931 S.W.2d at 289–94. To remedy these infirmities, the *Long* court suggested, implicitly or expressly, that, among other things, a reasonable-person standard be adopted; the prohibited conduct be limited to that done with intent to inflict fear of bodily injury or death, to avoid First Amendment complications; the predicate acts be related to each other; and low-intensity emotional states—like "annoy," "embarrass," "harass," "alarm," "abuse," and "torment"—either be eliminated or limited statutorily so that they did not implicate First Amendment freedoms. *See id.* at 289, 291, 293–94, 296.

The stalking statute applicable to this case was adopted in 1997 "[w]ith the *Long* decision in mind. . . ." *Clements v. State*, 19 S.W.3d 442, 450 (Tex.App.-Houston [1st Dist.] 2000, no pet.). In the statute at issue here, "[t]he legislature incorporated many of the suggestions" made by the *Long* court, such as adopting a reasonable-person standard, eliminating all conduct that had been found vague ("annoy," "embarrass," "harass," "alarm," "abuse," and "torment"), and requiring a nexus among predicate acts. *See id.* at 450, 451. The

Legislature also limited the prohibited conduct (and its mens rea element) to that conduct threatening bodily injury or death. *See Long*, 931 S.W.2d at 293 (noting that other jurisdictions' stalking statutes so limited their statutes' mens rea requirements, so that First Amendment would not be implicated for that conduct). Were we to read sub-paragraph (a)(1) separately from sub-paragraphs (a)(2) and (a)(3)—so that sub-paragraph (a)(1) defined an independent act constituting stalking—we would eliminate entirely the objective, reasonable-person standard from that offense. *Compare* Tex. Pen.Code Ann. § 42.072(a)(1) (not containing objective, reasonable-person standard, but instead requiring only actor's belief or reasonable belief that *victim* will regard conduct as threatening bodily injury or death) *with id.* § 42.072(a)(3) (requiring that conduct be such that *reasonable person* would fear bodily injury or death for himself or herself). Therefore, reading the statute as did the trial court and State below would leave in place a potential vagueness deficiency that our Court has already held *was* corrected by the 1997 statute. *See Clements*, 19 S.W.3d at 450, 451. We decline to read the statute in a way that conflicts both with its plain reading and with the precedent of this Court.

Finally, the sparse case law considering the statute supports our interpretation. Although no court has expressly held that sub-paragraphs (a)(1) through (a)(3) are elements of a single offense, at least one court has so assumed without deciding. *See Battles v. State*, 45 S.W.3d 694, 700 (Tex.App.-Tyler 2001, no pet.) (indicating that State needed to prove all three matters under information in that case). Our opinion in *Clements* is not to the contrary. In *Clements*, in rejecting a facial vagueness challenge, we reasoned:

The language of the 1997 statute is not unconstitutionally vague. We find this

statute to thoroughly specify what conduct is prohibited and subject to prosecution. *For example, one way in which a person can be convicted of stalking is by engaging in conduct he knows or reasonably believes will be regarded by the other person as threatening bodily injury or death.* TEX. PENAL CODE ANN. *§ 42.072(a)(1)(A). It can also be an offense under the statute for a person to knowingly engage in conduct that would cause a reasonable person to fear bodily injury or death.* TEX. PENAL CODE ANN. *§ 42.072(a)(3)(A).* Therefore, the stalker is on notice of the prohibited conduct if he knows or believes the other person will regard that conduct as threatening bodily injury or death. As such, the previous vagueness problem no longer exists.

*Id.,* 19 S.W.3d at 450–51 (emphasis added). The point of the quoted text was to explain why the statute was not vague on its face. The point was *not* to imply that each of the stalking statute's sub-paragraphs (a)(1), (a)(2), and (a)(3) established a different act that could independently constitute the offense of stalking, and we disavow any reading of *Clements* that would support such an implication.

We hold that the trial court erred in charging the statutory elements disjunctively, so that the charge allowed the jury to find appellant guilty upon finding fewer than all of the elements of the offense of stalking.

## B. Harm

■ "[J]ury charge error requires reversal when the defendant has properly objected to the charge and we find 'some harm' to his rights." *Ngo v. State,* 175 S.W.3d 738, 743 (Tex.Crim.App.2005) (quoting *Almanza v. State,* 686 S.W.2d 157, 171 (Tex.Crim.App.1985)). We hold that the record reveals some actual harm. *See Arline v. State,* 721 S.W.2d 348, 351 (Tex.Crim.App.1986) (indicating that, when

defendant objects to charge error in trial court, appellate court must determine whether defendant "suffered 'some' actual, rather than theoretical, harm from the error."). The faulty information was read to the jury when appellant was arraigned. More importantly, in closing argument, the State more than once emphasized that appellant could be convicted either for having committed the specified acts under section 42.072(a)(1) or for those committed under section 42.072(a)(2) and (3). That is, the State emphasized the charge's erroneous disjunctive language. Given this record, we hold that appellant experienced some harm to his rights because of the charging error. *Cf. Ngo,* 175 S.W.3d at 750 (holding that egregious harm occurred when, among other things, prosecutor twice told jury that it could convict even if verdict was not unanimous).

We sustain appellant's issue four.

## Legal Sufficiency

In issue one, appellant argues that the evidence was legally insufficient to support his stalking conviction.

■ In a legal-sufficiency review, we view the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *King v. State,* 29 S.W.3d 556, 562 (Tex.Crim.App.2000); *Johnson v. State,* 23 S.W.3d 1,7 (Tex.Crim. App.2000). We must not substitute our own judgment for that of the fact finder, which is entitled to believe all, some, or none of any witness's testimony. *Jones v. State,* 944 S.W.2d 642, 648 (Tex.Crim.App. 1996); *Sharp v. State,* 707 S.W.2d 611, 614 (Tex.Crim.App.1986).

■ We measure evidentiary sufficiency against the elements of the offense as defined by the hypothetically correct

jury charge. *Malik v. State,* 953 S.W.2d 234, 239–40 (Tex.Crim.App.1997); *Sisk v. State,* 74 S.W.3d 893, 897 (Tex.App.-Fort Worth 2002, no pet.) (applying *Malik* to legal-sufficiency challenge in stalking case). The hypothetically correct jury charge sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Malik,* 953 S.W.2d at 240.

As explained above in our discussion of jury-charge error, the hypothetically correct jury charge in this case would have required the State to prove that appellant (1) on more than one occasion and pursuant to the same scheme or course of conduct that was directed specifically at Solis (2) knowingly engaged in conduct, including following Solis, (3) that he knew or reasonably believed that Solis would regard as threatening bodily injury or death to her, (4) that caused Solis to be placed in fear of bodily injury or death, and (5) that would cause a reasonable person to fear bodily injury or death for herself.[3] *See* Tex. Pen.Code Ann. § 42.072(a)(1)(A), (2), (3)(A). It is against this statutory paradigm that we gauge the sufficiency of the evidence.

## A. "On more than one occasion and pursuant to the same scheme or course of conduct that was directed specifically at Solis"

■ Appellant was charged with stalking Solis from March 1, 2001 through May 14, 2002. The undisputed evidence showed, among other things, that from at least August, September, or October 2001 through May 2002, appellant repeatedly sent flowers, letters, gifts, and cards to Solis—eventually almost daily—and that he actually called and went to her mother's place of business, when Solis and her mother had the same first and last name. The jury could rationally have believed that these actions constituted a course of conduct, occurring on more than one occasion, that was directed specifically at Solis.

## B. "Knowingly engaged in conduct, including following Solis"

■ Appellant repeatedly sent flowers, letters, gifts, and cards to Solis, eventually almost daily, and went to and called her mother's place of business. Once, appellant placed a gift on the car of Solis's friend, which was the same color as Solis's car, and which the jury could rationally have believed that appellant thought was actually Solis's car. After Solis first reported appellant's behavior to a church elder, Leon Kinloch, in either June or in the Fall of 2001,[4] the church elders decided to "monitor the situation" and to try to prevent appellant from sitting near Solis. However, they were unsuccessful at preventing his approaching her: "on multiple occasions," appellant would position himself "to either get in close proximity to [Solis] to pass her notes or to get in her line of sight to establish some sort of— what appeared to be to try to establish some sort of eye contact." After the elders had asked him to leave the congregation because of his actions toward Solis, appellant "often would drive through the parking lot of our Kingdom Hall"; after the elders told him not to drive through the parking lot, appellant at least once stood in another church's nearby parking lot in sight of those (including Solis) exit-

---

3. Because the parties assume that *Malik* required the State to prove these matters as part of the hypothetically correct jury charge, so do we.

4. Solis eventually talked to Elder Kinloch at least five times over the entire period about appellant's behavior.

ing the church. Solis testified that she believed that appellant was waiting specifically for her because he "kept staring at me ...," although she followed up by admitting that she did not know whether he was actually waiting for her. Finally, Elder Kinloch explained that Solis had come to him in the Fall of 2001 complaining that "according to her, [appellant had] been following her."

We give the term "following" its plain meaning. *See Clements*, 19 S.W.3d at 448. Applying that plain meaning, the jury could rationally have believed that appellant's conduct set out above constituted following Solis.

## C. "That appellant knew or reasonably believed that Solis would regard as threatening bodily injury or death to her"

■ There was evidence from which the jury could rationally have concluded that Solis exhibited behavior objectively demonstrating an extreme fear of appellant's conduct. For example, when Solis approached Officer Darren Veazy on January 29, 2002 with her first complaint about appellant's behavior, Officer Veazy observed that Solis was "terrified that [appellant] would not leave her alone," "terrified of what this guy was doing," and "terrified of what [his] next action would be"; that she was "extremely scared," "scared to death," and "frightened"; that she "was visibly shaken [and] upset"; and that "her voice was quivering." Officer L.R. Roman, the second officer to interview Solis, described Solis's demeanor in March 2002, when Solis made a second complaint about appellant, as "scared."

Similarly, when Solis first reported appellant's behavior to church Elder Kinloch in either June or in the Fall of 2001, Elder Kinloch described Solis's demeanor as "very concerned." Elder Kinloch described Solis's demeanor during the period that the church's "monitoring" period and afterwards as "very, very concerned," "very, very jittery and jumpy," "incredibly nervous," "consistently nervous," "extremely jumpy," and "maybe even frightened so much so that she was hesitant to attend meetings," "so fearful of the situation that she actually stopped coming to the Kingdom Hall," "afraid of her shadow," and "consistently in fear of someone coming up behind her." The elder explained that Solis's demeanor over the last three years had changed "dramatically."

And there was more evidence of Solis's manifestation of fear. Solis's mother explained that, because of appellant's advances, Solis started "getting scared to go to the gym," feeling that "[m]aybe there's a possibility that ... he knows exactly where I go and I can be followed," getting "really worried about it," thinking "that maybe someone was following her," and being "a nervous wreck." In a letter dated April 29, 2002, appellant admitted that, when he once touched Solis's arm at church with a notepad, she "jumped about a foot and a half into the air" and "said something like, oooooughhhhhuh." Solis confirmed that she had been scared during the incident that appellant's letter recounted.

The jury also heard evidence that appellant was told that his conduct was seriously frightening Solis and that he should leave her alone. For example, on January 29, 2002, Officer Veazy told appellant that his actions were "terrifying" Solis, that "she didn't want any contact with him," and that "he should just leave her alone." The officer also told appellant that night that if appellant's conduct continued, the officer would send a report "to the DA for stalking." In addition to Officer Veazy's doing so, Elder Kinloch talked to appellant about the situation, asking him to stop sending Solis things, at least once in No-

vember or December 2001 and possibly more than once. When appellant's behavior toward Solis continued, the church elders eventually asked appellant to leave the congregation.

From this evidence—both of Solis's manifestations of fear and of appellant's being told directly of the effect that his conduct was having on Solis—the jury rationally could have concluded that appellant either knew or should have known that Solis would regard his conduct as threatening bodily injury or death to her.

### D. "That caused Solis to be placed in fear of bodily injury or death"

██ Contrary to appellant's suggestion in his brief, Solis testified expressly that she feared that appellant would cause her death or bodily injury because of his behavior. This testimony sufficed to support the jury's implicit finding of this element.[5]

### E. "That would cause a reasonable person to fear bodily injury or death for herself"

██ Solis had never even spoken to appellant, encouraged appellant to take any interest in her, or had any contact with appellant (except for her written refusals to have lunch with him the very first time that he sent her notes) at any time before or after he began his efforts in March 2001. Nonetheless, starting in August, September, or October 2001, appellant repeatedly and persistently—and, later, even daily—pursued Solis through letters, cards, flowers, and gifts. Appellant called and came to Solis's mother's store and left things in the mailbox there. Appellant's letters used language that one might use if one were intimate with some-

one or knew that person extremely well, stating that he and Solis would marry, referring to their children and grandchildren, and often speaking in language that indicated that he believed that their love was deep and mutual and that their marriage was a fait accompli. Appellant also referred to Solis's buttocks, to wanting to see her breasts, and to how they would keep his bedroom busy after they were married—all without her having spoken even one word to him.

Even after Elder Kinloch had told him to leave Solis alone and to leave the congregation, appellant "often would drive through the parking lot of our Kingdom Hall" and at least once stood nearby in sight of those (including Solis) exiting the church. Appellant's efforts became more frequent as time went on, and he continued his conduct even after he had been advised by Officer Veazy (January 2002) and Elder Kinloch (Fall of 2001) that Solis was terrified or did not welcome his advances and that he should leave her alone; even after he had been expelled from the church because of his behavior toward Solis; and even after he had been arrested for this offense.

Even as early as January 2002, Officer Veazy was "concerned" with appellant's behavior because "[i]t just wasn't normal" and because appellant had admitted already having watched Solis for a very long time. The officer also opined that, although Solis did not mention on her first visit to him that appellant had injured or threatened to injure her, the officer "could understand where [Solis] was coming from," given appellant's conduct. As for appellant's conduct at church meetings,

---

**5.** Officer Roman testified that Solis told her in January 2002 that she did not feel threatened then, and that Solis never mentioned afterwards feeling threatened. However, that evidence, which implicitly contradicts Solis's and Officer Veazy's testimony, is not viewed in the required light, and we may not consider it for purposes of our legal-sufficiency review.

Solis explained: "[W]e even got up to move [at church] and he kind of just got mad and he, you know, stormed out a couple of times when the Elders told him, you know, 'You can't sit there' or 'You can't do that.'" Most importantly, the following exchange occurred during cross-examination of Elder Kinloch:

Q: Do you really think that I would physically harm the lady? [6]

A: *Yes.*

Q: Why do you so answer? You saw nothing in the cards, nothing there that indicates harm?

A: Your interactions with me—with me, being a fairly good-sized male, indicated that, when you disagreed or someone disagreed with you, you demonstrated a loss of temper.

(Emphasis added.)

Given the above testimony, the jury rationally could have concluded that the frequency, escalation, content, and unsolicited nature of appellant's conduct, as well as his display of at least some anger when others disagreed with him or prevented his sitting near Solis, would have caused a reasonable person to fear bodily injury or death for herself.

## F. Conclusion Concerning Legal Sufficiency

We hold that the evidence was legally sufficient to support each element of the offense as set out in the hypothetically correct charge for stalking.

Accordingly, we overrule issue one.[7]

**6.** Appellant represented himself below, with appointed counsel standing by.

**7.** In issue two, appellant challenges the factual sufficiency of the evidence to support his

### Constitutionality

In issue three, appellant asserts that the stalking statute is unconstitutional on its face and as applied to him.

"All laws carry a presumption of validity." *Clements*, 19 S.W.3d at 450 (considering facial vagueness and overbreadth challenges to current stalking statute). "The party challenging a statute has the burden to establish its unconstitutionality." *Id.* "We uphold the statute if we can determine a reasonable construction that will render it constitutional and carry out the legislative intent." *Lewis v. State*, 88 S.W.3d 383, 392 (Tex.App.-Fort Worth 2002, pet. ref'd) (so providing in case considering facial constitutionality of current stalking statute).

To prevail in a facial constitutional challenge, one must generally show that there is no set of circumstances under which the statute would be constitutional. *Briggs v. State*, 789 S.W.2d 918, 923 (Tex. Crim.App.1990). However, "it has been suggested by the [United States] Supreme Court that in situations where a law reaches a 'substantial amount of constitutionally protected conduct' a facial challenge can be made to the statute even when it conceivably could have some valid applications." *State v. Markovich*, 77 S.W.3d 274, 279 (Tex.Crim.App.2002) (quoting *Kolender v. Lawson*, 461 U.S. 352, 358 n. 8, 103 S.Ct. 1855, 1859 n. 8, 75 L.Ed.2d 903 (1983)); *Sanchez v. State*, 995 S.W.2d 677, 683 (Tex. Crim.App.1999) (indicating that "under the First Amendment, a statute may be subject to a facial challenge even though it may have some legitimate application, but absent the First Amendment, 'a facial challenge could be mounted successfully

conviction. Given our disposition of issue four, we need not reach appellant's issue two: even if the latter issue is meritorious, it would result only in a remand, which is the same remedy as for charge error.

only if the statute were vague in all of its applications.'") (quoting *Long*, 931 S.W.2d at 295). In an as-applied constitutional challenge, in contrast, a defendant asserts that, as applied to him in his situation, the statute is unconstitutional. *Bynum v. State*, 767 S.W.2d 769, 774 (Tex.Crim.App. 1989).

## A. Overbreadth

A statute is unconstitutionally overbroad if "in its reach it prohibits constitutionally protected conduct." *Clements*, 19 S.W.3d at 451. Nonetheless, for a facial overbreadth challenge to succeed, the statute "must reach a substantial amount of protected conduct," as even protected speech may be regulated to some degree. *Id*. For purposes of an overbreadth challenge, "while conduct does not lose First Amendment protection merely because the actor intends to annoy the recipient, such conduct is much less likely to enjoy protection where the actor intends to 'frighten' the recipient, *and such conduct is unlikely to enjoy any protection where the actor intends to place the recipient in fear of death or bodily injury.*" *Long*, 931 S.W.2d at 293 (emphasis added); *see Clements*, 19 S.W.3d at 451.

### 1. Facial Challenge

Appellant argues that the current stalking statute is facially overbroad because it (1) does not describe "[t]he type of prohibited conduct"; (2) does not define "following"; (3) allows non-threatening conduct that could be protected under the First Amendment to be converted into an offense once a threat is made; and (4) is "not saved by its attempt to insert a reasonable person standard" because it does not specify from whose perspective the conduct must be reasonable. We disagree.

First, this Court, in *Clements*, expressly rejected appellant's argument (3). *See id.* at 451 (indicating that current statute addressed *Long* court's overbreadth concerns

by prohibiting only conduct causing fear of bodily injury or death, which fell outside First Amendment protection, and by requiring nexus among all acts constituting offense); *accord Lewis*, 88 S.W.3d at 392. Second, the *Clements* court also implicitly rejected appellant's argument (1) because, in considering a facial vagueness challenge, the Court indicated that the statute "thoroughly specif[ies] what conduct is prohibited and subject to prosecution." *Id.* at 450; *see Lewis*, 88 S.W.3d at 392 ("A person who knows or reasonably believes his conduct will be regarded as threatening bodily injury or death is necessarily on notice that his conduct is prohibited."); *see also State v. Seibert*, 156 S.W.3d 32, 37 (Tex. App.-Dallas 2004, no pet.) (In reversing trial court's order quashing indictment, stating that "[a] statute is not rendered unconstitutionally vague merely because words or terms are not specifically defined."; rejecting defendant's argument that undefined term "follow" in stalking statute rendered statute unconstitutionally vague on face; and holding that "[t]he term 'following,' alleged in the indictment, is not so broad as to encompass non-criminal activities."). We decline to revisit the conclusions reached in *Clements*. Third, the lack of a definition for "follow" does not render the statute facially overbroad because, among other things, that conduct must still have a nexus with the conduct in which bodily injury or death is threatened and feared. *See* TEX. PEN.CODE ANN. § 42.072(a) (requiring the multiple acts to be "pursuant to the same scheme or course of conduct" as that in which bodily injury or death is threatened and feared); *cf. Clements*, 19 S.W.3d at 448 (applying plain meaning of "follow" in context of legal-sufficiency review). As for appellant's argument (4), the statute *does* indicate from whose perspective each element of the offense is to be viewed:

- The first element is viewed from *the actor's* perspective. *See id.*

§ 42.072(a)(1) (prohibiting knowing engagement in conduct that "the actor knows or reasonably believes [the victim] will regard as ... threatening bodily injury or death for [the victim]....").

- The second element is viewed from *the victim's* perspective. *See id.* § 42.072(a)(2) (providing that the actor's conduct must "cause[ ] the [victim] ... to be placed in fear of bodily injury or death....").

- The third element is viewed from the *reasonable person's* perspective. *See id.* § 42.072(a)(3) (providing that actor's conduct must be such that "would cause a reasonable person to fear ... bodily injury or death for himself or herself....").

### 2. As–Applied Challenge

■ Appellant's only argument that the stalking statute is overbroad as applied to him is that he was only attempting to court Solis, a protected exercise of his First Amendment rights, and never threatened, harmed, or intended to frighten her. Given the facts as set out above, however, appellant's continuing his conduct after, for example, having been advised by two sources that he was terrifying Solis or that his advances were unwelcome and should be stopped removes his actions from the First Amendment protection, or at least prevents the stalking statute from curtailing a substantial amount of protected conduct in appellant's case. *See Clements,* 19 S.W.3d at 451. Furthermore, the jury rationally could have believed that the evidence, as set out above, surpassed mere courting.

### B. Vagueness

■ To survive a challenge that it is unconstitutionally vague, "a criminal statute must give a person of ordinary intelligence a reasonable opportunity to know what is prohibited." *Id.* at 451 (citing *Grayned v. City of Rockford,* 408 U.S. 104, 108–09, 92 S.Ct. 2294, 2298–99, 33 L.Ed.2d 222 (1972)). Additionally, the statute "must establish determinate guidelines for law enforcement." *Long,* 931 S.W.2d at 287. Finally, when First Amendment rights are implicated, "the law must be sufficiently definite to avoid chilling protected expression," that is, the law's specificity must be greater than would be required in other contexts. *Long,* 931 S.W.2d at 287; *Clements,* 19 S.W.3d at 450. As with an overbreadth challenge, in a vagueness challenge, "conduct is much less likely to enjoy [First Amendment] protection where the actor intends to 'frighten' the recipient, and ... is unlikely to enjoy any protection where the actor intends to place the recipient in fear of death or bodily injury." *Long,* 931 S.W.2d at 293 (recognizing same with regard to facial vagueness challenge to stalking statute).

### 1. Facial Challenge

■ Appellant argues that the stalking statute is facially vague because it (1) "fails to give fair notice of what conduct may be permitted, forcing people to guess at the statute's meaning, and threatening to trap the innocent" who might simply be persistent in courtship and (2) "fail[s] to establish guidelines for those charged with enforcing the law...."

This Court has already rejected a facial vagueness challenge to the stalking statute:

> The language of the 1997 statute is not unconstitutionally vague. We find this statute to thoroughly specify what conduct is prohibited and subject to prosecution.... [T]he stalker is on notice of the prohibited conduct if he knows or believes the other person will regard that conduct as threatening bodily injury or death. As such, the previous vagueness problem no longer exists.

*Clements,* 19 S.W.3d at 450–51 (citations omitted). We decline to revisit that holding, with which other courts have agreed. *See Seibert,* 156 S.W.3d at 37; *Lewis,* 88 S.W.3d at 392 ("Conduct enjoys no First Amendment protection when the actor intends to place the recipient in fear of bodily injury or death.... A person who knows or reasonably believes his conduct will be regarded as threatening bodily injury or death is necessarily on notice that his conduct is prohibited."); *Sisk,* 74 S.W.3d at 901–02. Moreover, the *Clements* Court also rejected an argument—akin to appellant's argument here that the statute does not give notice that persistent courtship might, under the specified circumstances, constitute an offense—that the statute was facially vague because it "impinged upon the marriage relationship" and "prohibit[ed] [Clements's] constitutionally protected conduct of attempting to 'save' his marriage." *Id.* at 449, 451. The Court rejected this argument because, as it expressly held in another portion of the opinion, the statute required that *the actor* know or reasonably believe that the victim would regard his conduct as threatening bodily injury or death and because such conduct enjoyed no First Amendment protection. *See id.* at 450–51; *see also* TEX. PEN.CODE ANN. § 42.072(a)(1)-(3). Similarly, within the current statute, the "bodily injury or death" limitation, as well as the "pursuant to the same scheme or course of conduct" requirement, establish a determinate guideline for law enforcement: mere courtship alone, even persistent courtship, does not suffice. *See Battles,* 45 S.W.3d at 703 (holding that term "pursuant to the same scheme or course of conduct" establishes determinate guidelines for law enforcement); *Sisk,* 74 S.W.3d at 901 (holding that stalking statute establishes determinate guidelines for law enforcement); *see also Long,* 931 S.W.2d at 293–94 (suggesting that limiting former stalking statute to bodily-injury-or-death situation might help cure facial vagueness problem).

### 2. As–Applied Challenge

 Appellant alternatively argues that the statute was vague as applied to him because "[a]ppellant, the police, the prosecution, and the jury were all left to speculate about whether a crime had occurred."

For example, appellant points to Officer Veazy's testimony that, when Solis first approached him on January 29, 2002, the officer "wasn't quite sure if [appellant's conduct had] met the elements of any crime."[8] However, Officer Veazy's cited

---

8. The officer elaborated as follows:

> A: I did feel that it was proper to write a report and send it to the District Attorney's office, to let them decide whether or not there is a valid case; and, if so, they can always issue a warrant.
>
> . . .
>
> A: I believe I told you that, since she told you that she didn't want to see you anymore, and that you were continuing, if [appellant's conduct] did continue, that this report would be sent to the DA for stalking.
>
> . . .
>
> Q: For stalking? So, you suggested stalking?

> A: At that time, yes, I thought your actions of—that you had even said that you had been watching her for a very long time.
>
> . . .
>
> A: I thought it was meeting the definition of stalking.
>
> Q: But as you understood the Penal Code, it was stalking?
>
> A: Actually, sir, if I—if I had totally understood the law word for word and I thought that you were stalking and it would have been a felony at that point. I wouldn't have needed an arrest warrant. But I had probable cause to believe that there was something going on. I probably would have arrested you. But I wasn't quite sure of all the elements of the crime and if they had

testimony might be explained by, as he also indicated, his not filing "many stalking cases"—that is, his lack of experience with the offense itself, rather than the statute's failure to give "determinate guidelines for law enforcement." *See Long,* 931 S.W.2d at 287. In any event, we hold that appellant had sufficient "opportunity to know what [wa]s prohibited" under the facts of this case. *See Clements,* 19 S.W.3d at 450 (requiring, to avoid vagueness challenge, that criminal statute provide such notice). By January 29, 2002, *both* Officer Veazy *and* the Elder Kinloch had advised appellant either that he was terrifying Solis or that he should leave her alone. Appellant nonetheless continued his behavior after that date. Appellant was surely on notice of "what [wa]s prohibited" after both the police and his elder had advised him of the detrimental effects of his behavior on Solis and had warned him to cease his actions. *See id.* Moreover, the jury could rationally have believed that Solis objectively manifested signs of extreme fear at appellant's behavior, which would also have placed him on notice.[9]

Appellant also relies on the jury's having sent a note asking why it took from January 2002 until March 2002 to file charges. Because it is unclear why the jury asked this question, the note does not show that the jury found the statutory language too vague to apply in appellant's case.

### C. Conclusion Concerning Constitutionality

We overrule issue three in its entirety.

### Conclusion

We reverse the judgment of the trial court and remand the cause.

been made. So, I basically told you that, since Ms. Solis didn't want you around her anymore or sending her any more notes, it was best that you just leave her alone and that if it continued, I would submit this report up for stalking.

Q: So, then, in your mind, it did not meet the classification legally of stalking?

A: That's not what I meant. What I meant was: I believed that you may have been—I don't write many stalking [sic]. I don't file many stalking cases. Yes, I did have the Penal Code with me. Some of it is confusing. It's always best to write the report and send it to the DA; and if they deem that there is sufficient probable cause on the case to go forward with it to get a warrant or somebody proceed with it versus masking [sic] a bad arrest—

Q: I see, in your mind, then it was stalking or potentially stalking?

A: I thought we were getting pretty close to it.

9. Appellant also relies on the testimony of Officer L.R. Roman, the second officer to review Solis's complaint in January 2002, which appellant describes as evidencing the opinion that stalking had *not* occurred. Although Officer Roman did testify that, "[a]fter reading the case [report] initially, [she] didn't think it met the elements for stalking at that point," she was not initially as unequivocal as appellant describes. For example, the officer contacted Solis on January 30, 2002 and took her statement over the phone. After having taken that statement, and "in response to" what Solis told the officer, Officer Roman "told [Solis] I was going to contact the district attorney's office and advise them of what was going on and see if it met the elements for stalking...." It was only some time after March 2002 that the officer tried to file the complaint as harassment. In any event, Officer Roman's testimony is similar to that of Officer Veazy, and we reject appellant's challenge based on the former officer's testimony for the same reason that we rejected appellant's challenge based on the latter officer's testimony.