# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-24-00072-CR

---

**Alexandro Correa, Appellant**

**v.**

**The State of Texas, Appellee**

---

**FROM THE 147TH DISTRICT COURT OF TRAVIS COUNTY
NO. D-1-DC-22-904053, THE HONORABLE P. DAVID WAHLBERG, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

Appellant Alexandro Correa challenges his conviction for third-degree stalking. *See* Tex. Penal Code § 42.072. In three issues, he contends that: the evidence was insufficient to prove that he had the requisite mental state to commit the offense, the trial court erred when it permitted the State to amend the indictment over his objection after the trial had commenced, and the court's charge erroneously included both "nature of conduct" and "result of conduct" language in the definitions of the mental states of intentionally and knowingly. We affirm.

## BACKGROUND

In mid-November 2018, Jami Mendoza was preparing to open a new CrossFit gym later that year. She testified that while at the not-yet-open gym, she used the Favor app to order dinner, which was delivered by Correa. Instead of leaving after delivering the food, Correa walked further into the gym without invitation. Correa engaged Mendoza in conversation about

the building.  She described her response as "a very awkward but nice gesture" of explaining what the building was going to be used for.  She did not expect to interact with him again.  However, they connected on Facebook through her personal and business pages.

Copies of social-media posts and messages were admitted into evidence.  In late November, Correa sent Mendoza a Facebook message that stated, "Apparently I'm flashing people now," with a photo attached that depicted Correa wearing a shirt for the gym sold on Mendoza's website.  Around this time, Correa changed the photo for his Facebook account to a photo of Mendoza in front of a mural painted on the outside of her gym.

Mendoza testified that Correa attended the grand opening of the gym in early December.  Over the next couple of weeks Correa came into the gym "a handful of times" looking for Mendoza, which she described as awkward because he was not a member of the gym or attending classes and would interrupt her when she was working with her members.  She described him as "a stranger."  Correa started leaving "random items" for Mendoza, such as a little basket full of magazines, a bag of children's gifts, and a book that she believed was personal to him.  She compared receiving the gifts to when "a cat brings somebody like dead things to show them little gifts and appreciations."  She testified that she responded by "being polite and a bit naive" and thanking him for the gifts and for coming by the gym.  About one week into December, Correa started calling her "love" in Facebook messages, which made her "extremely uncomfortable."  The next day, he sent her a Facebook message with photos of his trailer home, invited her to move in with him, and gave instructions on where to find his house key.  He also asked that if she stopped by that she "please excuse the smell of ass [and] balls."  Mendoza described this offer as unsolicited and uncomfortable.  Mendoza replied to Correa's message and declined his offer.  Her reply explained that she enjoyed living alone with her

2

"guard dog," informed him that she would return his book, and asked him to "please [] not take [her] kindness as any more than a friendship."

Nicholas Kosik, a trainer at the gym, testified that Correa would come by the gym and immediately ask where Mendoza was. Correa was not a member of the gym and never signed up for training with Kosik. One time Correa left his journal for Mendoza. Three days after Mendoza told Correa that they were just friends, Correa interrupted a wellness class on anxiety that Kosik and Mendoza were facilitating. Correa entered by stomping into the class late. Kosik testified that the mood of the whole class changed, he felt irritated, and Mendoza looked disturbed based on her body language. Correa contributed to the conversation but seemed upset and drunk. Some of the things Correa said were, "All people are animals. Everyone should die. All people suck." Correa then "got up abruptly" and "aggressively stomped out." Before leaving, he put "a leather-bound something" on the table in front of Mendoza and said, "We'll be in touch." Kosik testified that this left him feeling fearful and vulnerable, and he immediately spoke with Mendoza about getting a protective order. After that incident Kosik spent less time at the gym by only being there when necessary for scheduled coaching.

Mendoza testified that the wellness classes were usually attended by members and their friends but were open to all. The day after Correa disrupted her wellness class, Mendoza sent him a Facebook message:

> Good morning, Alexandro. I would like to address a very important issue. Last night during a class I was teaching, you came in unannounced, and displayed disruptive behavior. It made the clients who paid to be there, very uncomfortable. I am going to need you to please understand I'm running a business, hosting classes, that are paid for by members, and need the boundaries respected. I provide human services to clients who trust me to give them a safe and

3

comfortable environment. As with any business, I need you to respect the boundaries in which I operate my time, my services, and integrity.

I appreciate your local support to the business, but I'm asking you to understand a professional[']s boundaries, as last night I feel a major line was crossed.

Correa replied through several messages: "Thank you Jami. Picking up t-shirt. Notebook. Sorry. And we're done. Great weeks. Don't want you in my life."[1] Mendoza replied, "Please do not take this as an attack to your character, but a mutual respect. Thank you. Coach Nick is there right now if you wish to grab the things you have left at the gym." Correa continued his reply, "Or your stupid guard dog. Erasing you as we speak. Goodbye." Mendoza then blocked Correa on Facebook. Mendoza testified that through those messages she was communicating that Correa was not welcome at the gym if he was not a member.

A few days later, Correa started messaging Mendoza on Instagram. He sent a series of messages without a reply from her. He told her he loved her. He sent a message stating, "Just letting you know we're going to die. At least it will be a beautiful death. Take care. We'll be in touch." He invited her to call him because, "If we are going to do this, we [have] a lot to discuss." Mendoza testified that the messages made her sick to her stomach because they included a death threat, and she believed that the matter he wanted to discuss is how they would both die. After receiving the messages, Mendoza called the police. She locked all the doors at her gym and waited for the police. While waiting she received a call from the same number that Correa provided in his Instagram message. At the time, the number was

---

[1] We include the content of Correa's messages for their value as evidence of his intent or knowledge of his conduct, not as standalone occurrences of harassment based on their content. *See Owens v. State*, ___S.W.3d ___, No. PD-0075-24, 2025 WL 1587690, at *9 (Tex. Crim. App. 2025) (concluding that section 42.07(a)(7) was unconstitutional as applied to Owens because how it was used "prosecuted [him] for the content of his messages" rather than manner or action of sending them).

4

unknown to her, and she did not know it was the number that he provided. She answered in case it was a call regarding membership to the gym. When she answered, she heard Correa repeating her name in a low, monotone voice. She screamed, told him to stop calling her, and continued to wait for the police. When the police arrived, she told them about the messages and showed them the phone number that Correa had called her from.

Corporal Matthew Nonweiler with the Austin Police Department testified that he was dispatched to Mendoza's gym. He had been given an access code to get into the gym and was informed that the owner had barricaded herself inside because she had been receiving unwanted messages for a couple of weeks that had escalated to death threats. When he arrived, Mendoza was distraught and fearful. Corporal Nonweiler collected evidence from Mendoza, including a photo of Correa, his name, and his phone number. He then confirmed Correa's identity using a police database and had Officer Daniel McLeish call Correa at the number provided.

Officer McLeish testified that he called Correa to confirm his identity and connection to the phone number. That phone call was recorded by his body camera, and the video was admitted into evidence. On the call, after the officer identified himself but before he identified Mendoza or mentioned a 911 call, Correa interrupted him and began explaining his side of the story to the officer. In response to Correa's explanations, the officer responded: "It sounds like you have no intention of seeing her ever again anyways. Hopefully we can just end it there. . . . If you end up leaving each other alone this is probably where it will end. . . . It sounds like you are not going to see her again, so I don't think we have any problems." The officer confirmed on cross-examination that he did not tell Correa not to contact Mendoza or that

5

Mendoza did not want contact with Correa. That phone call was made at about 4:30 p.m. and lasted about seven minutes.

Between 5:49 p.m. that same evening and 1:17 p.m. the next day, Correa publicly "checked-in" on Mendoza's gym's business Facebook page over 80 times, with over 20 of the "check-ins" including private messages. Mendoza found out about the "check-ins" and messages when she was awoken the day after she had called the police by her sister calling her. Her sister was "panicking" and asking if Mendoza was at or near the gym. Mendoza did not receive any alerts of the check-ins and messages because she had blocked Correa, but Mendoza's sister, who was a co-manager of the business page, did. Mendoza called the police again.

Detective Jeffrey Thomas testified regarding his investigation. In early January 2019, he read Correa a cease-and-desist warning over the phone. Detective Thomas testified that after his phone call, Correa called Mendoza at 9 p.m. that night. In mid-January, Correa left a floral arrangement in front of Mendoza's gym, and the social-media records showed two "check-ins" by Correa on the gym's Facebook page on the same evening that the flowers were left. Correa was arrested the day after the flowers were left. Mendoza testified that Correa was seen by police in front of the gym, chased down the street, and arrested.

Correa testified in his own defense and admitted to visiting Mendoza's work, sending the social-media messages, and leaving the flowers. Correa denied ever intending to make Mendoza uncomfortable. He testified that he did not slam anything during the anxiety class and that Mendoza never told him not to go back to the gym after that but rather that he had to behave if he did. He explained that the message referencing death was being taken out of context and was referencing a time that Mendoza told him it was her dream to bring awareness to the world. Correa explained that historical "teachers of awareness," like Jesus Christ, have

6

things go badly for them and that if a person "really want[s] to try to bring awareness to the world, there's a high possibility that, you know, we're going to get killed because a lot of people do not want awareness." When asked why he switched to Instagram messages after being blocked by Mendoza on Facebook, he replied that he did not know that he was blocked on Facebook because he "unfriended" her. He further explained that he switched to Instagram because "she did want a relationship, and she just didn't want to admit it," but he could no longer communicate with her through Facebook. Regarding the flowers, he testified that he did not intend for her to know he left them.

After hearing all the evidence, the jury found him guilty of third-degree stalking. *See* Tex. Penal Code § 42.072. The trial court suspended his sentence and placed him on four years' community supervision. *See generally* Tex. Code Crim. Proc. ch. 42A. Correa appealed.

## SUFFICIENCY OF THE EVIDENCE

In his first issue, Correa contends that the evidence was insufficient to prove that he had the requisite mental states to have committed the offense of stalking.

### *Standard of Review*

The sufficiency of the evidence is measured by the elements of the offense as defined in a hypothetically correct jury charge, which is "one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). "When addressing a challenge to the sufficiency of the evidence, we consider whether, after viewing all of the evidence in the light most favorable to the verdict, any rational

7

trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Zuniga v. State*, 551 S.W.3d 729, 732 (Tex. Crim. App. 2018) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "This standard requires the appellate court to defer 'to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" *Id.* (quoting *Jackson*, 443 U.S. at 319). "We may not re-weigh the evidence or substitute our judgment for that of the factfinder." *Id.* (citing *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007)). Although factfinders "may not speculate about the meaning of facts or evidence," they are permitted to "draw any reasonable inferences from the facts so long as each inference is supported by the evidence presented at trial." *Id.* (citing *Cary v. State*, 507 S.W.3d 750, 757 (Tex. Crim. App. 2016); *Hooper v. State*, 214 S.W.3d 9, 16-17 (Tex. Crim. App. 2007)). "We presume that the factfinder resolved any conflicting inferences from the evidence in favor of the verdict, and we defer to that resolution." *Id.* (citing *Merritt v. State*, 368 S.W.3d 516, 525 (Tex. Crim. App. 2012)). This is because the factfinders are "the exclusive judges of the facts, the credibility of the witnesses, and the weight to be given to the testimony." *Id.* (citing *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010)). "Direct evidence and circumstantial evidence are equally probative, and circumstantial evidence alone may be sufficient to uphold a conviction so long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Id.* (citing *Ramsey v. State*, 473 S.W.3d 805, 809 (Tex. Crim. App. 2015)).

*Discussion*

Correa contends that there is no evidence that he intended to make Mendoza fearful for her safety or knew that his actions would have such an impact on her. We disagree. Correa's contention is based on his explanation of the events presented at trial. Notably, he did not deny visiting Mendoza at work, leaving her unsolicited gifts, disrupting her class, sending her numerous social-media messages, or leaving the flowers. Rather, he insists that he and Mendoza had a mutual connection, that they were getting to know each other, and that she is his soulmate. He contends that the references to death in his messages were either metaphorical and poetic in nature or were social and political commentary.

The relevant portions of the Texas Penal Code defining the offense of stalking as of the charged offense date provided:

> A person commits an offense if the person on more than one occasion and pursuant to the same scheme or course of conduct that is directed specifically at another person, knowingly engages in conduct that:
>
> > (1) constitutes an offense under Section 42.07 [(harassment)], or that the actor knows . . . the other person will regard as threatening:
> >
> > > (A) bodily injury or death for the other person;
> >
> > (2) causes the other person . . . to be placed in fear of bodily injury or death . . . or to feel harassed, annoyed, alarmed, abused, tormented, embarrassed, or offended; and
> >
> > (3) would cause a reasonable person to:
> >
> > > (A) fear bodily injury or death for himself or herself;
> > >
> > > . . . or
> > >
> > > (D) feel harassed, annoyed, alarmed, abused, tormented, embarrassed, or offended.

9

Tex. Penal Code § 42.072(a). "A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result." *Id.* § 6.03(a). "A person acts knowingly, or with knowledge, . . . when he is aware of the nature of his conduct or that the circumstances exist [or] that his conduct is reasonably certain to cause the result." *Id.* § 6.03(b).

The relevant portions of the harassment statute as of the charged offense date provided that "[a] person commits an offense if, with intent to harass, annoy, alarm, abuse, torment, or embarrass another, the person . . . sends repeated electronic communications in a manner reasonably likely to harass, annoy, alarm, abuse, torment, embarrass, or offend another." *Id.* § 42.07.

Thus, regarding the requisite mental states, as charged in this indictment, the State had to establish that on more than one occasion and pursuant to the same scheme or course of conduct, Correa *knowingly* engaged in conduct that: constituted the offense of harassment by sending repeated electronic communications with the *intent* to harass, annoy, alarm, abuse, torment, or embarrass Mendoza; or that he *knew* that Mendoza would regard as threatening her with bodily injury or death.

Here, the evidence is sufficient to support the requisite mental states for at least two occurrences of harassing or threatening conduct. First, Correa sent Mendoza a message through Instagram that she described to the jury as a death threat, which stated: "Just letting you know we're going to die. At least it will be a beautiful death. Take care. We'll be in touch." According to the combined testimony of Kosik and Mendoza, that message was sent after Correa disrupted Mendoza's wellness class by stomping in late, talking about death, slamming something on the table in front of Mendoza, telling Mendoza that they would "be in touch," and

10

then aggressively stomping out of the room. Kosik testified that Mendoza "looked disturbed" by Correa's actions in the class. Mendoza informed Correa that he had crossed a line and then blocked him on Facebook. Correa then switched social-media platforms, found Mendoza on Instagram, and messaged her about death and being in touch. The jury could have believed that Correa knew that Mendoza would regard being informed that she was going to die, that it would be a beautiful death, and that he would be in touch as threatening her with bodily injury or death. *See Zuniga*, 551 S.W.3d at 732; *see also Vernon v. State*, 571 S.W.3d 814, 820 (Tex. App.—Houston [1st Dist.] 2018, pet. ref'd) ("[W]e defer to the jury on questions of witness credibility, and we presume that they resolved any confusion in favor of the verdict"). The jury also could have reasonably inferred that Mendoza feared bodily injury or death and that a reasonable person would have feared bodily injury or death in those circumstances.

Second, after sending the "beautiful death" message to Mendoza, Correa "checked-in" to Mendoza's business page on Facebook over 80 times, including over 20 attached private messages, in a 24-hour period. Just a couple of hours before the check-ins started, Mendoza had responded to Correa's phone call—in which he repeated her name in a monotone voice—by screaming and telling him to stop calling her. About an hour after the phone call, Correa was called by police and knew that it was about Mendoza without being told. A jury could have reasonably inferred that Correa intended "to harass, annoy, alarm, abuse, torment, or embarrass" Mendoza when he sent her "repeated electronic communications" and that they were sent "in a manner reasonably likely to harass, annoy, alarm, abuse, torment, embarrass, or offend" Mendoza. *Id.* § 42.07.

We conclude that the evidence is sufficient to support Correa's conviction for the offense of stalking. *See Ploeger v. State*, 189 S.W.3d 799, 811 (Tex. App.—Houston [1st Dist.]

11

2006, no pet.) (concluding that "the jury rationally could have concluded that the frequency, escalation, content, and unsolicited nature of appellant's conduct, as well as his display of at least some anger when others disagreed with him or prevented his sitting near [the victim], would have caused a reasonable person to fear bodily injury or death for herself"). We overrule his first issue.

## INDICTMENT

In his second issue on appeal, Correa contends that the trial court erred by allowing the State to amend the indictment over his objection after the commencement of trial. The indictment alleged that Correa engaged in conduct that he "knew or reasonably should have known" that Mendoza would regard as threatening bodily injury or death. After the State rested its case, defense counsel moved for dismissal, arguing that the stalking statute is unconstitutional because of the inclusion of "should have known" as a mental state. In response, the State informed the trial court it would abandon the "should have known" mental state and proceed only on "knew." Correa objected. The trial court overruled Correa's objection.

An amendment to an indictment is a change that affects the form or substance of the indictment. Tex. Code Crim. Proc. art. 28.10. After the trial begins, a matter of form or substance in an indictment may be amended if the defendant does not object. *Id.* art. 28.10(b). If the amended indictment charges the defendant with an additional or different offense or if the substantial rights of the defendant are prejudiced, it may not be granted over a defendant's objection. *Id.* art. 28.10(b). However, not every change to an indictment amounts to an amendment. *Eastep v. State*, 941 S.W.2d 130, 132 (Tex. Crim. App. 1997), *overruled on other grounds by Riney v. State*, 28 S.W.3d 561, 565 (Tex. Crim. App. 2000). An abandonment does

12

not affect the substance of a charging instrument and does not trigger the requirements of Article. 28.10. *Id.* One way an abandonment occurs is when the change eliminates a way or means of committing an offense. *Id.* at 133.

Here, the State did not amend the indictment, but rather abandoned one of the ways they could have proven Correa committed the offense of stalking. Specifically, they abandoned the "should have known" mental state and proceeded with "knew." *Cf. Jefferson v. State*, 189 S.W.3d 305, 311 (Tex. Crim. App. 2006) (explaining in context of jury unanimity requirement that when several different mental states will satisfy statute's intent or mens rea element of alleged offense, those mental states are alternate means of committing alleged offense). We overrule Correa's second issue.

## COURT'S CHARGE

In his final issue on appeal, Correa contends that the trial court erred by including the full statutory definitions for the culpable mental states of "intentionally" and "knowingly" in the court's charge. The statutory mental-state definitions for "intentionally" and "knowingly" each include two conduct elements—nature of the conduct and result of the conduct. Tex. Penal Code § 6.03(a), (b). Correa contends that the stalking statute is a result-of-conduct offense and that the trial court's inclusion of the nature-of-conduct instruction was reversible error.

Jury-charge-error claims are reviewed under a two-pronged test in which the appellate court must determine: (1) whether the charge was erroneous, and (2) if there was an error, whether the error was harmful to the defendant. *Olivas v. State*, 202 S.W.3d 137, 143–44 (Tex. Crim. App. 2006); *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g).

13

Generally, "[a] trial court errs when it fails to limit the language in regard to the applicable culpable mental states to the appropriate conduct element" for the charged offense. *Price v. State*, 457 S.W.3d 437, 441 (Tex. Crim. App. 2015). "We use the gravamen of the offense to decide which conduct elements should be included in the culpable mental-state language." *Id.* Nature-of-conduct offenses are ones in which "specific acts are criminalized because of their very nature" and the culpable mental state applies to committing the act itself. *Id.* Result-of-conduct offenses involve "unspecified conduct that is criminalized because of its result" and require culpability as to that result. *Id.* An offense may include a combination of more than one conduct element. *Hill v. State*, 265 S.W.3d 539, 541 (Tex. App.—Houston [1st Dist.] 2008, pet. ref'd). Further, "when an offense is not clearly categorized as either a 'result' or 'nature of the conduct' type offense, it is not error for the trial court to submit the statutory definitions of 'intentionally' and 'knowingly.'" *Saldivar v. State*, 783 S.W.2d 265, 267 (Tex. App.—Corpus Christi–Edinburg 1989, no pet.).

The Court of Criminal Appeals has concluded that Penal Code Section 42.07(a)(7)—harassment by sending repeated electronic communications—is a nature of conduct offense. *Ex parte Sanders*, 663 S.W.3d 197, 215 (Tex. Crim. App. 2022) (explaining that "[t]he gravamen of the § 42.07(a)(7) offense is the sending of repeated electronic communications in a manner reasonably likely to harass, annoy, alarm, abuse, torment, embarrass, or offend another (nature of conduct)"). The stalking statute incorporates the harassment statute and provides that a person commits an offense if he "*knowingly* engages in conduct that . . . constitutes [harassment]." Tex. Penal Code § 42.072(a) (emphasis added). One of the charged means of which Correa was accused of committing the offense of stalking is through Subsection (a)(7) of the incorporated harassment statute, which in relevant part provided

14

that "[a] person commits an offense if, with *intent* to harass, annoy, alarm, abuse, torment, or embarrass another, the person . . . sends repeated electronic communications in a manner reasonably likely to harass, annoy, alarm, abuse, torment, embarrass, or offend another." *Id.* § 42.07(a)(7) (emphasis added).

Thus, we conclude that the trial court did not err when it included the statutory language regarding nature of conduct in the definitions for the mental states of intentionally and knowingly. Because we have concluded there is no trial-court error, we do not analyze harm in this case. *See* Tex. R. App. P. 47.1. We overrule Correa's final issue.

## CONCLUSION

Because we overruled all of Correa's issues, we affirm the trial court's judgment of conviction.

_____
Darlene Byrne, Chief Justice

Before Chief Justice Byrne, Justices Kelly and Ellis

Affirmed

Filed: November 20, 2025

Do Not Publish

15