ACCEPTED
06-14-00053-CR
SIXTH COURT OF APPEALS
TEXARKANA, TEXAS
2/22/2015 5:21:52 PM
DEBBIE AUTREY
CLERK

## In the Court of Appeals for the
## Sixth District of Texas at Texarkana

FILED IN
6th COURT OF APPEALS
TEXARKANA, TEXAS
2/23/2015 10:05:00 AM
DEBBIE AUTREY
Clerk

**Anthony David Teague,** §
    Appellant §
§
v. § **No. 06-14-00053-CR**
§
**The State of Texas,** §
    Appellee §

On Appeal from Cause Number 366-82919-2013 in the 219th District Court Judicial District Court of Collin County, Texas, the Honorable Scott J. Becker, Judge Presiding.

§ § §

## State's Brief

§ § §

**Greg Willis**
Criminal District Attorney
Collin County, Texas

**John R. Rolater, Jr.**
Assistant Criminal District Attorney
Chief of the Appellate Division
SBT#00791565
2100 Bloomdale Rd., Ste. 200
McKinney, Texas 75071
(972) 548-4323
FAX (214) 491-4860
jrolater@co.collin.tx.us

**Holly Griffin**
**Jonathan Richardson**
Assistant Criminal District Attorneys

**Table of Contents**

Index of Authorities ................................................................................................ iii

Statement of the Case.................................................................................................1

Statement Regarding Oral Argument ........................................................................1

Statement of Facts.....................................................................................................2

Summary of the State's Arguments .........................................................................11

State's Reply to Appellant's First Issue..................................................................12

    The trial court was not required to conduct an informal inquiry into Appellant's
    competence to stand trial because there was not a suggestion that Appellant was
    incompetent to stand trial and no facts before the trial court required it to suggest
    Appellant's incompetence sua sponte. ...............................................................12

    *Standard of Review*...........................................................................................12

    *Applicable Law* ................................................................................................12

    *Argument* .........................................................................................................13

State's Reply to Appellant's Second Issue .............................................................16

    The State's evidence is sufficient because Appellant repeatedly engaged in
    conduct directed at RK that he knew would place her in fear of bodily injury or
    death, she did fear she would suffer bodily injury or death, and her fear was
    objectively reasonable. ......................................................................................16

    *Standard of Review*...........................................................................................16

    *Applicable Law* ................................................................................................17

    *Appellant's Sufficiency Argument is Contrary to the Statutory Text and
    Unsupported by Applicable Authority*................................................................17

    *Ample Evidence Supports Appellant's Conviction for Stalking, Including
    Threats, Disclosures, Following the Victim, and Evidence of Her Fear* .............18

Prayer ......................................................................................................................21

Certificate of Service ...............................................................................21

Certificate of Compliance .......................................................................22

# Index of Authorities

## Cases

*Brooks v. State,*
  323 S.W.3d 893 (Tex. Crim. App. 2010) ...........................................................16

*Fluellen v. State*,
  443 S.W.3d 365 (Tex. App.—Texarkana 2014, no pet.) ........................ 12, 14, 15

*Jackson v. Virginia,*
  443 U.S. 307 (1979) ........................................................................................16

*Montgomery v. State*,
  810 S.W.2d 372 (Tex. Crim. App. 1991)(op. on reh'g) ......................................12

*Ploeger v. State*,
  189 S.W.3d 799 (Tex. App.—Houston [1st Dist.] 2006, no pet.) .... 17, 18, 19, 20

*Pomier v. State*,
  326 S.W.3d 3731 (Tex. App.—Houston [14th Dist.] 2010, no pet.) ...................18

*Turner v. State*,
  422 S.W.3d 676 (Tex. Crim. App. 2013) ................................................. 14, 15, 16

## Statutes

Act of May 19, 2011,
  82nd Leg. , R.S., Ch. 591, § 1,
  2011 Tex. Sess. Law. Serv. 1433 .......................................................................17

Tex. Code Crim. Proc. art. 46B.003(a) .................................................................13

Tex. Code Crim. Proc. art. 46B.004(a) .................................................................13

Tex. Code Crim. Proc. art. 46B.004(b) .................................................................13

Tex. Code Crim. Proc. art. 46B.004(c) .................................................................13

Tex. Penal Code § 22.01 .......................................................................................18

Tex. Penal Code § 42.072 ............................................................................... 17, 18

**To the Honorable Court of Appeals:**

**Statement of the Case**

Appellant was convicted of stalking after a jury trial. He pleaded true to a single enhancement paragraph, and the jury found the enhancement paragraph to be true. The jury assessed punishment at 20 years' confinement in the Texas Department of Criminal Justice and a fine of $10,000. CR 1730.

**Statement Regarding Oral Argument**

Appellant has not requested oral argument and the State likewise does not request oral argument. The State does not believe oral argument will assist the Court in deciding the case.

**Statement of Facts**

In late Summer of 2012, RK was about to begin a graduate program in video game design at the Guildhall, a program of Southern Methodist University located in Plano, Collin County, Texas. 3 RR 99-100, 108, 127, 238-40. The school started a Facebook page that allowed the students to meet one another before classes began. 3 RR 99. RK met her roommate, AH, this way, as well as Appellant. 3 RR 99-100. RK met Appellant at a group dinner for students at BJ's Brewhouse. 3 RR 100, 241-42.

RK found Appellant to be unusual, but he was someone that she could talk to. 3 RR 101. They communicated frequently on Facebook. 3 RR 101. Appellant helped her get furniture at IKEA and move into her apartment, and he helped her buy items for her apartment at Home Depot. 3 RR 101-102, 242-43. They also spent time together at group functions with fellow students, and spent time together after one of these functions. 3 RR 101-102.

The two spoke frequently on the phone and by text message. 3 RR 244-45. Appellant told RK he wanted a romantic relationship, but she told him frequently and bluntly that she did not want that type of relationship. 3 RR 102. RK had recently been through a bad breakup. 3 RR 102. Appellant tried giving her gifts, but that made RK uncomfortable and she refused the gifts except for a lighter and

some cat toys. 3 RR 102-103. Appellant was "adamant" and "pushy" that she should accept the gifts. 3 RR 103-104.

The Guildhall program consisted of forty to forty-five students who were in class all day, every day. 3 RR 108. Appellant sat behind her in class, but he would follow her outside whenever she took a break to smoke. 3 RR 108. Appellant was jealous of their male classmates and made comments about them. 3 RR 107.

After classes began, the relationship between RK and Appellant briefly became intimate. 3 RR 104, 244, 246. Appellant pressured her to become more intimate with him, and she did. 3 RR 104. He badgered her "we should kiss," "we should have sex," and "this is what you want." 3 RR 104. RK "was in a bad place emotionally" and immediately regretted allowing the relationship to become sexual. 3 RR 104, 246. RK and Appellant had sexual encounters three times in about a week. 3 RR 105. RK told Appellant it was a mistake and she wasn't comfortable with that type of relationship, but he kept trying to convince her otherwise. 3 RR 104-105. Eventually, he agreed to take a step back, but they got drunk with a group of students after a test and had sex for the third, and last, time. 3 RR 106.

On August 28, 2012, after meeting with her counselor, RK felt empowered and told Appellant that the intimate relationship would stop. 3 RR 109. Appellant became angry and irrational, bouncing between despondence and saying cruel and

vulgar things. 3 RR 110. Appellant sent RK 69 text messages, called her three times, and posted many messages on Facebook. 3 RR 110; SX7; SX 5; SX 6. On Facebook Appellant called RK a "selfish cunt" and told her to "fuck off… seriously just die." SX 6 at 6. By text message he told her "someday you'll regret your choices" and "[i]f you try to give me that lighter back you'll regret it." SX 5 at 3, 13. But, more ominously, Appellant kept insisting that he need to see RK even though she refused to see him. He would ask if he could come over, then when told no, would still say he was coming over. SX 5 at 6, 8, 15. Appellant also threatened to tell RK's ex-boyfriend they had slept together and to give him RK's address. SX 5 at 13, 17; SX6 at 33. Ultimately, Appellant called the police and sent them to RK's home at 4 a.m., telling them he was afraid she would hurt herself. 3 RR 132; SX 5 at 18. On the phone he screamed at her, called her a slut, and said things about her and her family that "were very manipulative." 3 RR 132.

Appellant's behavior made RK fearful. 3 RR 168-70. He tried to get her to leave her apartment in the middle of the night. 3 RR 168; SX6 at 52. He told her on Facebook that he knew she responded to fear and that he used that as a tactic. 3 RR 170; SX 6 at 56. He told her that he masturbated while talking to her on the phone. SX 6 at 30, 32. And he accused her of having sexual feelings for another classmate. SX 6 at 32. When RK told him she didn't deserve to be spoken to like that, Appellant told her "you deserve much worse… now fuck off before you get

4

it." SX 6 at 32. Appellant vaguely threatened to post photos of RK on Facebook, although she did not believe him to possess any compromising photos of her. 3 RR 170, 266-67.

Several days later, RK agreed to meet Appellant at a Starbucks because he promised to leave her alone if she did. 3 RR 171-72. Appellant tried to "twist things" during the meeting and attack her psychologically. 3 RR 173. He also tried to kiss her and touch her even though she told him not to. 3 RR 174. After she left the meeting at Starbucks, she went home, then to visit a classmate, CF. 3 RR 184. While she was at CF's apartment, Appellant sent her a video of a love song. 3 RR 185-87. RK believed this meant Appellant knew where she was at the time because he was jealous of CF, knew where CF lived, and her car was parked in front of CF's apartment. 3 RR 185-87.

On September 8, 2012, RK was forced to call the police when Appellant was messaging "adamantly" that he was coming over to her apartment. 3 RR 187-88. She called them again the next day when Appellant, who seemed irrational, insisted that he was coming to her apartment even though she told him there was nothing he could not say over the phone. 3 RR 188-89. By September 12, RK and her roommate began staying at other places to avoid Appellant. 3 RR 190-91. SMU issued a "no contact" letter to Appellant and published it to the other students, and

he received a criminal trespass warning for SMU's campuses including the Guildhall. 3 RR 188-89; 4 RR 29, 63.

But even after Appellant was kicked out of the Guildhall and ordered not to contact RK he continued to do so. 3 RR 188-89. RK had friends stay at her apartment when her roommate was away. 3 RR 192. Appellant also contacted other persons about RK. 3 RR 192. On October 22, 2012, Appellant came into a different Starbucks where RK was studying even though it was away from the area where he lived. 3 RR 194-95. Six days later, Appellant left a pack of cigarettes on her car while she was watching movies with a group at CF's apartment. 3 RR 198. RK was terrified because Appellant was following her again. 3 RR 199-200. Her friends followed her home that night, and she called police again when she received a call from a blocked number at 4:00 a.m. the next morning. 3 RR 199-200. Appellant called again while the police were there and she could hear his voice on the phone speaking to the police. 3 RR 199-200.

Others witnessed Appellant's stalking behavior toward RK. One of the Guildhall students, SK, noticed that Appellant was jealous of other people and was ready to propose to RK within a month even though they did not sit together in class and Appellant complained that RK did not know what she wanted. 4 RR 27. SK advised Appellant that RK was young and had just ended a long term relationship. 4 RR 27-28. SK also thought Appellant should not date someone "his

daughter's age" in a closed program of forty people. 4 RR 27-28. Appellant was spiteful and asked SK what other girl in the program he could use to make RK jealous. 4 RR 28. Although SK thought RK did not reciprocate Appellant's feelings, Appellant said that she did and that the two had "hooked up." 4 RR 28-29.

Appellant came to SK's apartment unannounced the same day that the Guildhall informed the other students of the no contact order. 4 RR 29-30. He told SK and another student that they "were going to hear some things about [RK]," that she was "very confused," and that they should "not be mad at her." 4 RR 30-31. Appellant was nervous and agitated during the conversation, but it was not unusual behavior for him. 4 RR 32. SK had to ask him several times before he would leave the apartment. 4 RR 32-33.

CF had talked with Appellant after classes had started, and both had discovered they liked RK. 4 RR 36-37. Appellant told CF "she's all yours" and that he had a relationship with a girl in Dallas he was going to pursue, but he also seemed visibly upset at the time. 4 RR 37. Appellant later told CF, in a casual statement in front of other students, that he and RK had had sex and that "it wasn't that great." 4 RR 37-38. Appellant contacted CF even after the Guildhall issued the no contact order. 4 RR 37-38. Appellant told CF that "he had to warn him about [RK]," that "[RK] intentionally draws people in to get the close and then pushes

them away." 4 RR 38. Appellant told CF that "[RK] wants to be punished" and that "he wants to fix her… that something was wrong with her." 4 RR 38. Appellant came to CF's apartment and talked about RK for three to four hours, but the things he said did not make a lot of sense. 4 RR 38-39. After Appellant left, RK came to CF's apartment and was "barely holding herself together." 4 RR 39-40. She told him Appellant had been stalking her and following her everywhere she went. 4 RR 40-41.

RK's roommate, AH, also a Guildhall student, did not learn of the failed relationship until several days after RK broke up with Appellant. 4 RR 47. RK woke her about 1 a.m. crying, and AH thought something had happened to RK's mother. 4 RR 47. RK told her about Appellant's actions, and AH listened as RK yelled at Appellant and told him he was "scaring her" and to "leave her alone. 4 RR 48-49. A few days later, Appellant insisted he was coming over, and RK and AH turned out the lights and hid in their apartment while he knocked on the door. 4 RR 50. AH called the police herself on another occasion when Appellant insisted he was coming over and RK was home alone. 4 RR 51. AH saw Appellant in their apartment parking lot at least twice during this time. 4 RR 53. AH cancelled appointments so that RK would not be alone, drove RK to school, and would buy cigarettes for RK so that she did not have to go to the gas station alone. 4 RR 56-57.

HT, another Guildhall student who lived in the same apartment complex, also saw Appellant in the apartments and thought it was strange. 4 RR 59. HT also saw Appellant several days later at another student's birthday party to which RK was invited but Appellant was not. 4 RR 60-61.

Plano Police Officer Ray Arnold was dispatched to RK's apartment on September 9, 2012, regarding Appellant's behavior. 4 RR 73-75. She was upset and scared and asked Arnold to contact Appellant and tell him leave her alone. 4 RR 75. Arnold called Appellant and told him RK did not want him to contact her any more, including on social media. 4 RR 75-77. Appellant told Arnold he had seen the officer drive into RK's apartment complex, and left because he was scared. 4 RR 76. Appellant told Arnold he understood the request and acted as if he would comply. 4 RR 77. Appellant was calm on the phone. 4 RR 77.

Plano Police Officer Robert Mills was dispatched to RK's apartment on October 28, 2012, along with Officer Brian Franz. 4 RR 82-84, 154. Mills patrolled the complex looking for suspicious activity while Franz contacted RK. 4 RR 84-85, 154-55. Appellant called RK while Franz was talking to her, and he answered the call "Hello Mr. Teague." 4 RR 156-57. Frantz told Appellant any further communications would be considered harassment. 4 RR 156. Appellant asked "who is this really?", and Franz identified himself by name and badge number. 4 RR 156. Appellant asked if Franz "was having sex with his girlfriend?"

4 RR 156-57. Franz said he was a Plano Police Officer and invited Appellant back to the apartment to speak with him. 4 RR 157. Mills also spoke to Appellant when he called back after Franz hung up on him. 4 RR 86-87.

Appellant also contacted RK's mother, who lived in Dallas. 4 RR 94-96. Appellant first contacted her by LinkedIn, but she later received phone messages and text messages from him. 4 RR 96-100; SX 15. She reported the inappropriate messages to the Dallas Police Department, who instructed Appellant to "cease and desist." 4 RR 101-103.

Appellant met with Plano Detective Phelan while the matter was under investigation. 4 RR 108-109. Phelan told Appellant on September 13, 2012, that RK wanted no more contact from him and that she was afraid of him. 4 RR 110. Appellant told Phelan that he was angry and unhappy with how RK had handled the matter. 4 RR 110. Appellant told Phelan he understood and promised to stop contacting RK. 4 RR 110-11. Phelan also spoke with Appellant on September 18, 2012, again telling Appellant that RK wanted no more communications from him and that she considered the relationship to be over. 4 RR 11. On October 29, 2102, Phelan again met with Appellant about another incident between him and RK. 4 RR 111-12. Appellant admitted to Phelan that he had continued to contact RK. 4 RR 112-13. In Phelan's opinion, Appellant's behavior was escalating. 4 RR 8.

**Summary of the State's Arguments**

The trial court was not required to conduct an informal inquiry into Appellant's competence to stand trial because there was not a suggestion that Appellant was incompetent to stand trial and no facts before the trial court required it to suggest Appellant's incompetence sua sponte.

The evidence is legally sufficient to prove that Appellant committed the offense of stalking because it shows that he repeatedly engaged in conduct that he knew would place her in fear of bodily injury or death, she did fear she would suffer bodily injury or death, and her fear was objectively reasonable.

**State's Reply to Appellant's First Issue**

In his first issue, Appellant claims the trial court erred in failing to conduct an informal inquiry into whether there was evidence he was incompetent to stand trial. The trial court was not required to conduct an informal inquiry into Appellant's competence to stand trial because there was not a suggestion that Appellant was incompetent to stand trial and no facts before the trial court required it to suggest Appellant's incompetence sua sponte.

*Standard of Review*

This Court reviews a trial court's failure to conduct an informal competency review for abuse of discretion. *Fluellen v. State*, 443 S.W.3d 365, 369 (Tex. App.—Texarkana 2014, no pet.). To show a clear abuse of discretion requires more than a showing that this Court disagrees with the trial court's determination of the issue. Rather, a clear abuse of discretion is shown only where the trial court's determination falls outside "the zone of reasonable disagreement" with regard to the determination. *Montgomery v. State*, 810 S.W.2d 372, 386, 391 (Tex. Crim. App. 1991) (op. on reh'g).

*Applicable Law*

To be competent to stand trial, a person must possess both a sufficient present ability to consult with the person's lawyer with a reasonable degree of rational understanding and a rational as well as factual understanding of the

proceedings against the person. *See* Tex. Code Crim. Proc. art. 46B.003(a)(1)-(2). Either party or the trial court may suggest a defendant is incompetent to stand trial. *See* Tex. Code Crim. Proc. art. 46B.004(a). If evidence suggesting the defendant may be incompetent comes to the attention of the trial court, it must suggest the defendant is incompetent. Tex. Code Crim. Proc. art. 46B.004(b). On a suggestion of incompetence, the trial court must conduct an informal inquiry to determine whether there is some evidence from any source that would support a finding that the defendant may be incompetent to stand trial. Tex. Code Crim. Proc. art. 46B.004(c).

*Argument*

Appellant argues the trial court erred in failing to conduct an informal competency review. Appellant's brief at 9-10, 11-13. But Appellant's argument focuses on historical facts related to his offense and incarceration rather than facts related to his mental status at or near the time of trial. Appellant references letters sent to the trial court in July and August of 2013. CR 121, 124, 127, 133. The trial testimony referenced by Appellant relates to events that transpired in the early fall of 2012. Appellant's brief at 12-13. But Appellant's trial took place in February of 2014. CR 1730. Appellant's two trial lawyers never suggested to the trial court that Appellant was unable to consult with them or did not understand what was occurring in court. Appellant only testified during the punishment phase, and then

13

only for the purpose of indicating to the trial court that he understood his Fifth Amendment rights, he did not testify at guilt because of his prior convictions, and he did not choose to testify in the punishment phase. 7 RR 202-205. Appellant points to nothing in this colloquy indicating Appellant could not consult with counsel or did not understand the proceedings in court.

Here, while the record contains some evidence that Appellant could not conform his conduct to what society expected of him, there is no evidence that Appellant could not consult with counsel and did not understand the nature of the proceedings. The facts of this case are similar to those reviewed by the Court in *Fluellen*. 443 S.W.3d at 367-70. In that case, Fluellen, while rejecting plea offers pretrial, essentially accepted the same offers by an open plea of guilty later in the trial. *Id*. at 369. Furthermore, there was some evidence of discord between Fluellen and his attorney. *Id.* Nevertheless, this Court noted that the record contained nothing indicating that Fluellen was not "fully engaged in the legal process" and competent to stand trial. *Id.* at 369-70. Thus, the trial court was not required to engage in an informal competency determination. *Id.*

The facts of the instant case are unlike those in *Turner v. State*, 422 S.W.3d 676 (Tex. Crim. App. 2013), where a sharply divided Court of Criminal Appeals found that the trial court should have conducted formal competency review even though prior examinations by mental health professionals had found Turner

14

competent to stand trial. In *Turner*, trial defense counsel several times requested that the trial court revisit the issue of Turner's competence because he refused to communicate with them, accused them of being in league with the prosecutors, maintained a strange story about the local mayor threatening him, and tried to fire his lawyers before final arguments. *Id.* at 679-87. The trial court even had Turner examined another time for competency, but Turner refused to cooperate. *Id.* at 683. The Court noted that the fact a defendant is mentally ill does not mean he is incompetent, nor does a refusal to cooperate with counsel. *Id.* at 691. But, when a defendant's mental illness operated to prevent him from rationally understanding the proceedings against him or engaging rationally with counsel in pursuit of his best interests, then he is incompetent. *Id.* Evidence that raises this possibility is what triggers an informal inquiry. *Id.* Ultimately, the Court in *Turner* remanded the case to the trial court for determination whether a retrospective competency determination could be made. *Id.* at 696-97.

This case is like *Fluellen*. The trial court received no information from trial counsel, Appellant, or other witnesses indicating that Appellant suffered from mental illness that prevented him from rationally understanding the proceedings against him or rationally assisting his counsel. Rather, the record contains only evidence showing that prior examinations had shown that Appellant was not incompetent. CR 1693-97. Accordingly, the trial court did not abuse its discretion

by failing to sua sponte suggest Appellant was incompetent and conduct an informal review under Article 46B.004(b).[1] Appellant's first issue should be overruled.

**State's Reply to Appellant's Second Issue**

In his second issue, Appellant claims the evidence is insufficient to sustain the jury's verdict. The State's evidence is sufficient because Appellant repeatedly engaged in conduct directed at RK that he knew would place her in fear of bodily injury or death, she did fear she would suffer bodily injury or death, and her fear was objectively reasonable.

*Standard of Review*

In determining whether the evidence is sufficient, a reviewing court views all the evidence in the light most favorable to the State and determines whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 318 (1979); *Brooks v. State,* 323 S.W.3d 893, 895 (Tex. Crim. App. 2010). This standard ensures that it remains the jury's responsibility to fairly resolve conflicts in the testimony, weigh the evidence, and to draw reasonable inferences from basic to ultimate facts. *Jackson,* 443 U.S. at 319.

---

[1] In the event the Court determines the trial court abused its discretion, the proper remedy is remand to the trial court to determine under Article 46B.0004(c) if there is some evidence of incompetency. If there is such, then the trial court should conduct a formal competency hearing pursuant to Article 46B. *See Turner*, 422 S.W.3d at 696-97 & n.42.

16

*Applicable Law*

A person commits the offense of stalking, as charged in this case, if a person, on more than one occasion and pursuant to the same scheme or course of conduct that is directed specifically at another person, knowingly engages in conduct that the person knows or reasonably believes the other person will regard as threatening bodily injury or death for the other person, causes the other person to be placed in fear of bodily injury or death, and would cause a reasonable person to fear bodily injury or death for himself. Act of May 19, 2011, 82nd Leg., R.S., Ch. 591, § 1, 2011 Tex. Sess. Law. Serv. 1433, current version codified at Tex. Penal Code § 42.072; *Ploeger v. State*, 189 S.W.3d 799, 807-808 (Tex. App.— Houston [1st Dist.] 2006, no pet.); CR. 20-22.

*Appellant's Sufficiency Argument is Contrary to the Statutory Text and Unsupported by Applicable Authority*

Here, Appellant concedes that Appellant's conduct was directed specifically at RK pursuant to the same scheme or course of conduct. Appellant's brief at 17. Appellant claims that the evidence is otherwise insufficient because there was "no history of violence, no protective orders,[2] no assaults, no weapons, nor [was] there a threat of bodily injury." Appellant's brief at 17. But Appellant's claim that violence, weapons and specific threats of harm are required is not consistent with the terms of Section 42.072 or cases applying the statute. Rather, the portion of the

---

[2] A protective order was issued in the case after Appellant was arrested. SX 8; 3 RR 203-204.

17

stalking statute applicable to Appellant penalizes those who "engage in conduct" that the actor "knows or reasonably believes" another person will find threatens bodily injury or death. In other offenses, the Legislature explicitly requires threats of bodily injury or injury in fact, while in the stalking statute they included no such requirement. *Compare, e.g.,* Tex. Penal Code § 22.01(a)(1)-(2) (offense of assault includes causing bodily injury or threatening imminent bodily injury) *with* Tex. Penal Code § 42.072(a)(1)-(3). Moreover, Appellant cites no authority supporting his claim that the absence of such evidence renders the evidence insufficient to sustain a conviction. Appellant's brief at 16-17. Appellant's sole authority, *Pomier v. State*, 326 S.W.3d 373, 379-81 (Tex. App.—Houston [14th Dist.] 2010, no pet.), finds a different set of facts to be sufficient to sustain a conviction, but it does not stand for the proposition that violence or a weapon is required to sustain a conviction for stalking.

*Ample Evidence Supports Appellant's Conviction for Stalking, Including Threats, Disclosures, Following the Victim, and Evidence of Her Fear*

In *Ploeger*, the court of appeals found the evidence sufficient to sustain a conviction for stalking on evidence similar to that in the instant case. Ploeger became fixated on a younger member of his church. He repeatedly sent her flowers, gifts, and notes even after he was asked to leave her alone and leave the church. Ploeger would stare at the victim and follow her. Ploeger's behavior made the victim nervous, "extremely jumpy," and fearful enough that she stopped

18

attending church. Ploeger's behavior continued even after he was told that it was scaring his victim and he should leave her alone. The victim testified that she feared Ploeger would hurt or kill her, but there was not testimony the he ever directly threatened her. The court of appeals held this evidence legally sufficient to sustain Ploeger's conviction for stalking. 189 S.W.3d at 808-811.

In comparison to *Ploeger*, the instant case contains evidence of more serious threats and conduct. Appellant exposed the intimate nature of his relationship with RK to other students and to her ex-boyfriend. 4 RR 37-38; SX 5 at 13, 17. He specifically threatened her if she discarded a gift and if she chose to break things off with him. SX5 at 3, 13. He repeatedly tried to meet with her despite her insistence she did not want to meet with him. SX 5 at 6, 8, 15; SX 6 at 52-53; 3 RR 168. Indeed, he admitted lying to her about his car breaking down in an attempt to lure her to meet him, an episode she described as "wake up dead in a ditch" material. SX 6 at 52-53; 3 RR 185. When she did meet with him, he attempted to touch her multiple times against her wishes and without her consent. 3 RR 171-74. And, he lurked near her apartment multiple times, followed her to CF's apartment on multiple occasions, and lurked near gathering of students she attended. 3 RR 186-87, 198-99; 4 RR 49, 53, 59-60. And, against her wishes, he contacted her again and again by multiple means to make threatening, crass, and scary comments. SX 5; SX 6; 3 RR 199-200. Appellant recognized that RK responded to

19

fear and attempted to use that to manipulate her. 3 RR 170; SX 6 at 56. And the record demonstrates she was fearful: she left her apartment, made arrangements never to be alone, and had her roommate drive her around and run public errands for her. 3 RR 190-92; 4 RR 56-57. Moreover, nothing in the record shows that RK's reaction to Appellant's behavior was objectively unreasonable. Rather, any young, single woman would be fearful of an older, larger man with an explosive personality who would not let go or go away. Appellant continued to act this way even though he knew his attentions were unwanted and they were causing RK fear. The evidence in the instant case amply supports the jury's verdict. *See Ploeger*, 189 S.W.3d at 808-11. Appellant's second issue should be overruled.

**Prayer**

The State prays that Appellant's conviction and sentence be affirmed.

Respectfully submitted,

**Greg Willis**
Criminal District Attorney
Collin County, Texas

/s/ John R. Rolater, Jr.
**John R. Rolater, Jr**
Assistant Criminal District Attorney
Chief of the Appellate Division
SBT#00791565
2100 Bloomdale Rd., Ste. 200
McKinney, TX 75071
(972) 548-4323
(214) 491-4860 fax
jrolater@co.collin.tx.us

**Certificate of Service**

A copy of the State's brief has been sent by electronic service to counsel for Appellant, Shawn S. Ismail, at shawnismail@gmail.com, on this, the 22nd day of February, 2015.

/s/ John R. Rolater, Jr.
John R. Rolater, Jr.

## Certificate of Compliance

This brief complies with the word limitations in Texas Rule of Appellate Procedure 9.4(i)(2). In reliance on the word count of the computer program used to prepare this brief, the undersigned attorney certifies that this brief contains 4,671 words, exclusive of the sections of the brief exempted by Rule 9.4(i)(1).

/s/ John R. Rolater, Jr.
John R. Rolater, Jr.