**Opinion issued November 13, 2025**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-23-00891-CV

————————————

**TERRI ANN TODD, Appellant**

**V.**

**SARAH MICHELLE GARZA AKA SARAH MICHELLE GALLEGOS,
Appellee**

---

**On Appeal from the 280th District Court
Harris County, Texas
Trial Court Case No. 2023-52304**

---

## MEMORANDUM OPINION

Terri Ann Todd appeals a three-year protective order issued against her for the protection of her daughter, Sarah Michelle Garza aka Sarah Michelle Gallegos, and two grandchildren. In two issues, Todd contends the trial court failed to make required findings and the evidence is insufficient to support the order. We affirm.

## Background

In August 2023, Garza applied on behalf of herself and her two children—an eleven-year-old boy and a ten-year-old girl—for a protective order against her mother Todd under Chapter 7B, Subchapter A of the Code of Criminal Procedure. Garza alleged that Todd had engaged in conduct that constituted stalking and harassment and was intended to "threaten, harass, annoy, alarm, abuse, torment, or embarrass" her and her children. She further alleged that Todd's conduct constituted family violence.

At the hearing on her application, Garza testified that her relationship with Todd was irreparably damaged by an incident that took place in January 2021. Garza's maternal uncle—Todd's brother—owned a car repair shop, where Garza and her sister worked. According to Garza, Todd came to the shop uninvited in January 2021 to accuse Garza's uncle of sexually assaulting her when she was a child:

> [Todd] shows up out of nowhere screaming, yelling, yelling accusations towards my uncle, my boss. She tries to access — I was in an upstairs office, she tries to access that office. She has a large wrench in her hand and she is yelling and screaming, "Where is Michelle?"

Garza explained that, at the time, she was in an office on the shop's second floor but she could see and hear what was happening in the shop below through a live camera

2

feed.[1]  When she screamed, "Where's Michelle," Todd was calling Garza by her middle name and trying to go up the stairs to where Garza was hiding.

Silent video footage from the shop's surveillance system shows Todd enter the reception area, have a verbal altercation with Garza's sister, and then walk into the garage.  In the garage, Garza's sister blocks Todd from accessing the stairs, Todd pushes against Garza's sister, and, visibly frustrated, begins damaging property in the garage and reception area.  Among other acts, Todd can be seen grabbing an impact tool from a utility cart and another tool from out of the frame in the garage, overturning the utility cart, pushing over a water cooler, using the impact tool and other objects to damage multiple computer monitors and a computer tower inside of the reception area, throwing furniture, pulling an alarm pad and other equipment from the walls, and smashing a decorative object.  Another video shows Todd taking a fire extinguisher from the shop, carrying it across the street to where Garza had parked her car, and striking Garza's car with the fire extinguisher.  After the incident, Garza found the fire extinguisher inside of her car, with the rear window smashed.

---

[1]  While Garza testified that she could see and hear what was happening in the shop through the live camera feed, the video exhibits admitted into the evidence do not include audio.

The cost to repair Garza's car was $5,000; the cost to repair the other damage caused by Todd was higher.[2]

After the January 2021 incident, Garza went "no contact" with Todd. Garza explained that even though Todd's behavior was not typical of Todd and Todd had not physically attacked her, Todd's "rage" during the incident "terrified" her. Garza believed Todd was angry with her for maintaining a relationship with her uncle despite Todd's sexual-assault allegation against him.

Garza did not press charges against Todd, but Todd was still charged with criminal mischief in connection with the January 2021 incident.[3] The conditions of Todd's pretrial bond prohibited Todd from contacting Garza, Garza's husband, and Garza's uncle. Todd ultimately received deferred adjudication community supervision on the charge, successfully completed the community supervision, and paid restitution.

Garza testified that when Todd's community supervision ended in April 2022, Todd began trying to contact her.

---

[2]  Additional testimony suggested that Todd also damaged property in a house in connection with the January 2021 incident. Garza testified that between the shop and the house, Todd caused about $30,000 in damages.

[3]  The indictment named Todd's brother—not Garza—as the complainant for the criminal mischief charge. The indictment alleged Todd damaged property including four windows, a door, two weed eaters, a table, a plant pot, three window screens, three computers, a jumper box, an alarm pad, and two impact tools.

4

By July 2022, Garza had switched jobs and was teaching at the private school her children attended on a church campus. The school principal testified that Todd called him with concerns about the school. She demanded to know why school administrators had not returned her call about "the complaint that she was having towards the church, getting abused, having sex offenders, or whatever the cause may be, on site." Unsatisfied with the principal's response, Todd pledged to bring protestors to the school and "make it as loud as possible so it's a disruption and it's going to be all over the news and this and that." The principal notified the school's administrative team and facility managers of Todd's statement, but nothing came of her pledge. To the principal's knowledge, Todd had not visited the school or threatened Garza's children, though she had visited the affiliated church.

A few months later, on November 15, Todd went uninvited to Garza's home. Garza was home with the children celebrating her son's birthday when Todd "showed up knocking on the door, banging on the door, and asking to be let in." In her declaration admitted into evidence at the hearing, Garza described Todd as looking "angry and irritated" as she knocked on the door. Garza hid in a closet with the children and called 911, claiming she was "afraid for [her] safety and [her] kids' safety" based on the January 2021 incident.

Garza testified that Todd knocked on the door for about ten minutes before leaving. When she left, Todd placed a birthday card from Todd's husband to Garza's

son and a letter from Todd to each of Garza's children on the front doormat. In the letters, Todd wrote that she loved the children, missed them, and hoped to be a part of their lives. Garza testified that even though the letters did not contain any threats, she was still frightened by them and Todd's uninvited visit to her home considering the events of January 2021.

The next day, Todd attended service at the church affiliated with the school, which Garza and her children were also attending, even though Todd did not usually attend service there and belonged to a different church. Garza testified that Todd's uninvited presence at the church caused Garza's children to cry and feel afraid.[4] She added in her declaration that she left the church with the children, took them to her classroom, and told her school supervisors about the "situation with [Todd]." Todd attended other services at the church as well, including a few weeks later when Garza again removed the children to her classroom to avoid Todd, locked the door, and stayed in the classroom until the service ended. During one of these church visits, Todd approached Garza's son and touched his cheek without permission.[5]

---

[4] On cross-examination, Garza was asked why her children would fear Todd. She testified that she told her son "a very filtered, as age appropriate as it could be, version" of the January 2021 incident "to keep him safe." She had also discussed the incident with her daughter.

[5] From the hearing testimony, it is not clear when the cheek touching occurred. But Garza's declaration states the touching happened in May 2023, that it caused her son to feel "upset, frazzled, [and] in shock" and to cry, and that they left the church immediately.

Then, toward the end of February 2023, Todd entered Garza's home while Garza was at work. Garza returned home to find a letter from Todd inside the house. Garza had not invited Todd to the home.[6] But when she reviewed footage from her security camera, Garza discovered that the woman who cleans her house had let Todd in. The letter Todd left inside was a written apology, which Garza tore up because she was "terrified" for herself and her children. Asked on cross-examination why it was so bad that Todd wanted to apologize, Garza responded, "[B]ecause it was inside my home." Garza confirmed that she felt "stalked" and "harassed" by Todd's conduct, again pointing to the January 2021 incident as the origin of her concerns. Garza was asked whether an "outside person looking in" might say Todd "is just trying to have a relationship with you." She answered:

A.   I'm terrified.

Q.   Why?

A.   Because of [the January 2021 incident]. What I lived through that day. I'm terrified for my kids.

Q.   Why?

A.   Because I've seen her [Todd's] violence and rage.

Q.   Okay. And do you believe that that violence and rage was towards you?

---

[6] Todd admitted in her testimony that she "purposely" went to Garza's home when she knew Garza would not be there because she did not want to upset Garza and she did not trust the postal service to deliver the apology letter.

7

A.    Yes.

Garza wrote to Todd a few months later, in May 2023, asking Todd to leave her alone and stop harassing her.  According to Garza's declaration, the letter read: "Leave us alone! You are harassing and further traumatizing my kids and I.  Leave us alone!"

Todd called the school once or twice after receiving Garza's letter.  Todd again claimed that she contacted the school out of concern for her grandchildren and others who attended the school because she believed the school was "allowing sexual predators in."  On cross-examination, she acknowledged telling one of the school administrators that Garza was treating her "as the devil incarnate," that Garza was a bad person, and that Garza should not have been hired as a "religious teacher."

Garza testified that, even though Todd had never physically harmed her, she felt threatened or harassed by Todd more than once, she believed Todd's behavior would continue to be alarming, and she worried Todd's conduct would humiliate her children, cause her to lose her job, or lead to more property damage.  She also claimed to have been diagnosed with post-traumatic stress disorder ("PTSD") after the January 2021 incident.

For her part, Todd denied that she was stalking or harassing Garza.  She explained that she went to the car repair shop in January 2021 to confront her brother about the sexual assault, not Garza.  She emphasized that she had taken responsibility

for the January 2021 incident, which she described as just "one episode" that she agreed was wrong, completed her community supervision early, paid restitution, and not had any similar incidents since. She previously was close with Garza and Garza's children and wanted to mend the relationship. She claimed that her interactions after the January 2021 incident were motivated by missing her grandchildren, whom she had not seen for more than three years.

Todd also presented testimony from her husband and a different brother. Todd's husband testified that Todd was not a threat to anyone. In his opinion, Garza's concerns were "truly unfounded" and stemmed from jealousy related to the adoption of another grandchild—Garza's niece—into Todd's home. Todd's brother testified that he also noticed jealousy from Garza after the adoption. He described Todd's behavior in the January 2021 incident as out of character, and noted he had not seen Todd behave that way before or after the incident.

At the end of the hearing, the trial court orally granted Garza's application for a protective order based on stalking and harassment. In ruling, the trial court commented on boundaries, remarking that once a child reaches adulthood, "there have to be boundaries . . . in order to keep everything on an even keel" and that Todd had violated those boundaries. The trial court told Todd, "[Y]ou can't go into people's homes, even if the housekeeper lets you in," "you also can't call her job and degrade her," and "you cannot approach a person, even if it's a child, and touch

them without their consent." The trial court continued, "When you went into that home, you crossed boundaries. When you called her job, you crossed boundaries. And when you touched that child, you crossed boundaries."

The trial court's written order made the protective order effective for three years. As grounds, the protective order recited the trial court's findings that "there are reasonable grounds to believe [Garza] is a victim of STALKING by [Todd]" and that the protective order is necessary for Garza's safety and to prevent family violence.[7] After requesting and obtaining findings of fact and conclusions of law, Todd appealed.

## Required Proof and Findings

We understand Todd as arguing that the protective order must be set aside because Garza did not prove, and the trial court did not find, that Todd committed

---

[7] We note that in its oral rendition at the end of the hearing, the trial court remarked that "probable cause" exists to believe that stalking and harassment had occurred, rather than "reasonable grounds." "Probable cause" is the standard for a protective order under Chapter 7B, Subchapter B. *See* TEX. CODE CRIM. PROC. art. 7B.052. Subchapter B applies for protective orders when a defendant is appearing at a proceeding relating to a stalking offense. *See Bevers v. Mabry*, No. 05-22-00713-CV, 2024 WL 469550, at *5 (Tex. App.—Dallas Feb. 7, 2024, pet. denied) (mem. op.) (noting that Subchapter B did not apply because, at the time the application was filed, there was no proceeding relating to a stalking offense in which a "defendant" was appearing, citing TEX. CODE CRIM. PROC. art. 7B.051(a)). Both the protective order itself and the trial court's findings of fact and conclusions of law correctly reference the Subchapter A standard for the protective order issued here, which requires a finding of "reasonable grounds to believe that the applicant is the victim" of certain offenses, including stalking. *See* TEX. CODE CRIM. PROC. arts. 7B.001(a), .003(a).

family violence. This argument conflates the requirements of a protective order under the Family Code with the requirements of a protective order under the Code of Criminal Procedure.

A person can request a protective order under either statute. *See Shoemaker v. State for Protection of C.L.*, 493 S.W.3d 710, 715 (Tex. App.—Houston [1st Dist.] 2016, no pet.) (observing that both the Family Code and the Code of Criminal Procedure authorize protective orders). Under the Family Code as it existed when this case was filed, a trial court may issue a protective order if it finds "that family violence has occurred and is likely to occur in the future."[8] TEX. FAM. CODE § 81.001. Relevant here, Chapter 7B, Subchapter A of the Code of Criminal Procedure authorizes a protective order on the trial court's finding that "there are reasonable grounds to believe that the applicant is a victim of [stalking]." TEX. CODE CRIM. PROC. art. 7B.003(a) (authorizing protective orders for victims of certain crimes, including stalking). No other fact findings are required under Chapter 7B,

---

[8] Several of the statutes governing protective orders were amended effective September 1, 2023, or later. *See* Act of Jun. 18, 2023, 88th Leg., R.S., ch. 947, § 2 (S.B. 1717) (amending certain provisions of Title 4 of the Family Code and Chapter 7B of the Code of Criminal Procedure, as well as Sections 42.07 and 42.072 of the Penal Code); *see also, e.g.*, 89th Leg., ch. 251 (H.B. 2596). Because Garza filed her protective-order application in August 2023, before the amendments were effective, we apply the prior versions of these statutes. *See Segundo Navarro Drilling, Ltd. v. San Roman Ranch Min. Partners*, 612 S.W.3d 489, 496 (Tex. App.—San Antonio 2020, pet. denied) ("[W]e must apply the statute as it existed at the time the lawsuit was filed[.]").

Subchapter A.[9]  *See id.*; *see also Netaji v. Roberts*, No. 03-19-00840-CV, 2021 WL 5312489, at *10 (Tex. App.—Austin Nov. 12, 2021, no pet.) (mem. op.) ("The trial court's protective order here includes its finding that '[r]easonable grounds exist to believe that Applicant has been the victim of stalking.'  This fact finding is the only necessary under [Chapter 7B, Subchapter A] for issuance of the order."); *R.M. v. Swearingen*, 510 S.W.3d 630, 633 (Tex. App.—El Paso 2016, no pet.) ("No additional showings beyond status as a crime victim are required to obtain the order [under Subchapter A].").

Here, Garza alleged in her application that Todd engaged in conduct that constituted stalking, which was intended to "harass, annoy, alarm, abuse, torment,

---

[9]     Todd also complains that the trial court did not explain how the evidence satisfies the elements of stalking in its findings of fact and conclusions of law, citing *Dessens v. Argeroplos*, 658 S.W.3d 438, 444 (Tex. App.—Houston [14th Dist.] 2022, no pet.).  In *Dessens*, the appellant complained that the trial court's findings could not be extended to support the protective order because they described only a single instance of threatening conduct—a single obscene email—and thus did not establish the "course of conduct" required by the stalking statue.  *Id.* at 444.  However, the court expressly refused in the opinion to hold that a trial court is required to make a finding on every subpart of the statue violated.  *Id.* at 447.  Here, the fact findings do not contain a detailed discussion of evidence, but in the legal conclusions the trial court made the only finding required for the protective order when it found reasonable grounds to believe Garza was the victim of stalking by Todd.  *See Ray v. Farmers' State Bank of Hart*, 576 S.W.2d 607, 608 n.1 (Tex. 1979) (where a finding of fact is contained in a conclusion of law, the trial court's designation is not controlling on appeal); *Garza v. Renteria*, No. 14-24-00079-CV, 2025 WL 2413260, at *4–5 (Tex. App.—Houston [14th Dist.] Aug. 21, 2025, no pet. h.) (mem. op.) (affirming protective order when trial court's oral rendition of judgment included finding of "reasonable grounds to believe" applicant was victim of stalking or harassment even though protective order did not).  Moreover, the trial court explained its reasoning when it orally rendered judgment.

or embarrass" her. Although she also alleged that Todd's conduct constituted family violence, she expressly requested relief under the Code of Criminal Procedure. Likewise, the trial court granted the protective order under the Code of Criminal Procedure, expressly finding reasonable grounds to believe Garza was a victim of stalking by Todd. This was the only required finding; neither proof nor a finding of family violence was needed. *See Netaji*, 2021 WL 5312489, at *10; *R.M.*, 510 S.W.3d at 633; *see also R.S. v. D.R.T.*, No. 01-22-00701-CV, 2023 WL 8938409, at *7 (Tex. App.—Houston [1st Dist.] Dec. 28, 2023, no pet.) (mem. op.) (rejecting argument that protective order must be set aside because there was no proof of family violence where trial court's Chapter 7B findings provided separate, independent basis for order); *Straughan v. Girsch*, No. 14-20-00763-CV, 2022 WL 2977049, at *4 (Tex. App.—Houston [14th Dist.] July 28, 2022, no pet.) (mem. op.) (same).

## Sufficiency of the Evidence

Todd contends the trial court erred in granting the protective order because its fact findings are not supported by legally or factually sufficient evidence and its legal conclusions cannot withstand de novo review.

### A.    The standard of review

We review a trial court's decision to grant or deny a protective order under Chapter 7B, Subchapter A of the Code of Criminal Procedure for legal and factual sufficiency of the evidence. *Shoemaker*, 493 S.W.3d at 714–15 (considering

13

predecessor statute that was recodified as Chapter 7B, Subchapter A without substantive changes).

When conducting a legal-sufficiency review, we consider the evidence in the light most favorable to the challenged finding and indulge every reasonable inference that would support it. *City of Keller v. Wilson*, 168 S.W.3d 802, 822, 827 (Tex. 2005). To prevail, an appellant must show that no more than a scintilla of evidence supports a finding on which the opponent had the burden of proof. *See Waste Mgmt. of Tex., Inc. v. Texas Disposal Sys. Landfill, Inc.*, 434 S.W.3d 142, 156–57 (Tex. 2014); *City of Keller*, 168 S.W.3d at 826. More than a scintilla of evidence exists to support a finding when the evidence enables reasonable and fair-minded people to differ in their conclusions. *Gharda USA, Inc. v. Control Sols., Inc.*, 464 S.W.3d 338, 347 (Tex. 2015).

When conducting a factual-sufficiency review, we consider all the evidence and set aside the trial court's order only if the evidence is so weak as to make the order clearly wrong and manifestly unjust. *See Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). Under both standards, the factfinder is the sole judge of the credibility of the witnesses and the weight of their testimony, and we defer to the factfinder's implicit credibility and weight determinations. *See City of Keller*, 168 S.W.3d at 816–17, 819–20, 822; *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003).

14

**B.      The stalking statue**

A trial court must grant a protective order under Chapter 7B, Subchapter A of the Code of Criminal Procedure if it finds there are reasonable grounds to believe the applicant is a victim of certain crimes, including stalking. TEX. CODE CRIM. PROC. art. 7B.003(a)–(b); *Bevers v. Mabry*, No. 05-22-00713-CV, 2024 WL 469550, at *7 (Tex. App.—Dallas Feb. 7, 2024, pet. denied) (mem. op.). Protective orders issued under the Code of Criminal Procedure may be effective for the duration of the lives of the offender and the victim or for any shorter period stated in the order. *See* TEX. CODE CRIM. PROC. arts. 7B.003(b), 7B.007(a); *Beach v. Beach*, No. 01-19-00123-CV, 2020 WL 1879553, at *3 (Tex. App.—Houston [1st Dist.] Apr. 16, 2020, pet. dism'd w.o.j.) (mem. op.).

Relevant here, the stalking statute incorporates an intent element, a subjective harm element, and an objective harm element. *See Bevers*, 2024 WL 469550, at *8. A person commits the offense of stalking if, on more than one occasion and pursuant to the same scheme or course of conduct that is directed specifically at another person, she knowingly engages in conduct that:

> (1)      . . . [she] knows or reasonably should know the other person will regard as threatening:
>
> (A)    bodily injury or death for the other person;
>
> (B)    bodily injury or death for a member of the other person's family or household . . . ; or

15

(C)     that an offense will be committed against the other person's property;

(2)     causes the other person [or] a member of the other person's family . . . to be placed in fear of bodily injury or death or in fear that an offense will be committed against the other person's property, or to feel harassed, annoyed, alarmed, abused, tormented, embarrassed, or offended; and

(3)     would cause a reasonable person to:

     (A)     fear bodily injury or death for himself or herself;

     (B)     fear bodily injury or death for a member of the person's family or household . . . ;

     (C)     fear that an offense will be committed against the person's property; or

     (D)     feel harassed, annoyed, alarmed, abused, tormented, embarrassed, or offended.

TEX. PENAL CODE § 42.072(a);[10] *Garza v. Renteria*, No. 14-24-00079-CV, 2025 WL 2413260, at *3 (Tex. App.—Houston [14th Dist.] Aug. 21, 2025, no pet. h.). A scheme or course of conduct can include different types of conduct described by the stalking statute, if done on more than one occasion. *Id.* at § 42.072(c).

## C.     The evidence is sufficient

Todd contends that the evidence is not legally or factually sufficient to support the trial court's finding of reasonable grounds to believe that Garza was a victim of stalking by Todd. She argues that the trial court could not reasonably find a

---

[10]     The pre-2023 amendment version of Section 42.072 applies here. *See* Acts 2013, 83rd Leg., ch. 1278 (H.B. 1606), § 2, eff. Sept. 1, 2013.

16

qualifying scheme or course of conduct directed at Garza because Garza's case rested exclusively on the January 2021 incident, which happened more than two and half years before Garza applied for the protective order and was a one-off incident that was directed at Todd's brother, not Garza. Todd characterizes her other conduct—leaving cards on Garza's doormat, entering Garza's home to deliver an apology letter, attending service at Garza's church, and touching her grandson's cheek—as "neutral" or "innocent" efforts to reconcile with her family or attend public worship. She disagrees this conduct could be viewed as threatening bodily injury or property damage because there is no evidence she physically attacked Garza or Garza's children, and she had not caused any property damage in the years after the January 2021 incident. She asserts the trial court's opinion that she "crossed boundaries" is not enough to support a protective order under the stalking statute. We conclude the evidence is both legally and factually sufficient.

The record contains ample evidence of a course of conduct directed at Garza that Todd knew or reasonably should have known Garza would find threatening bodily injury to her or that an offense would be committed against Garza's property. Garza testified that she began to fear for her own safety and the safety of her children and property after the January 2021 incident. Todd asserts that the January 2021 incident was too widely separated in time and directed only at Garza's uncle to be considered part of a scheme or course of conduct directed at Garza. But "[S]ection

17

42.072 does not specify a time period in which the scheme or course of conduct must occur; rather, it merely requires that the [actor's] conduct must occur 'on more than one occasion and pursuant to the same scheme or course of conduct.'" *Pomier v. State*, 326 S.W.3d 373, 379–80 (Tex. App.—Houston [14th Dist.] 2010, no pet.) (quoting TEX. PENAL CODE § 42.072(a)). Thus, by definition, the offense of stalking "contemplates the presentation of evidence that covers the *entire course* of a defendant's alleged unlawful conduct" directed specifically toward another person. *Id.* (internal quotation omitted).

In its role as factfinder, the trial court was free to disbelieve Todd's testimony that the January 2021 incident was directed only at Garza's uncle and instead believe Garza's testimony that she too was a target. *See City of Keller*, 168 S.W.3d at 816–17, 819–20, 822; *Golden Eagle Archery*, 116 S.W.3d at 761. Garza testified that Todd was angry with her for not rejecting her uncle, called out for her during the incident, and tried to gain access to the office where she was hiding. Garza's testimony that she was a target of the January 2021 incident is corroborated by the undisputed evidence that Todd used a fire extinguisher to strike Garza's car after not gaining access to Garza at the shop. Additionally, the trial court presiding in the criminal case against Todd listed Garza as a person whom Todd could not contact after the incident.

Contrary to Todd's assertion, the January 2021 incident is not the only conduct at issue. Instead, the protective order rests on conduct spanning two and a half years. Around April 2022, after she completed community supervision for the criminal mischief charge that resulted from the January 2021 incident and was no longer bound by the order prohibiting contact with Garza, Todd began trying to contact Garza despite Garza's wish not to have a relationship. Todd called and threatened to disrupt the school Garza worked at and the children attended a few months later. In November 2022, Todd visited Garza's home to see Garza's children, even though she had not been invited. Todd knocked for about ten minutes, and Garza never answered the door, instead hiding in a closet with her children and calling 911 because she was afraid for their safety.

Continuing her effort to see Garza's children, Todd attended service at Garza's church the next day, even though she was not a member of the church and did not usually worship there. Despite her presence at the church being distressing for Garza and Garza's children to the point that they left the church and hid in Garza's classroom, Todd attended service again a few weeks later. Then, in February 2022, Todd visited and entered Garza's home when she knew Garza would not be there. And finally, in July 2023, Todd again contacted Garza's place of employment—the school—and degraded Garza, telling Garza's coworkers that

19

Garza treated Todd as "the devil incarnate," was a "bad person," and "shouldn't have been hired" to teach at a religiously affiliated school.

We disagree the record establishes that this conduct was "innocent" or "neutral." Even if, as Todd suggests, she engaged in this conduct in an effort to keep school children safe from sexual predators when she called the school principal or to mend damaged family relationships through her other actions, there is evidence she reasonably should have known that Garza found her efforts threatening. *See* TEX. PENAL CODE § 6.03(b) (stating that "person acts knowingly, or with knowledge," with respect to nature of conduct or to circumstances surrounding conduct when she is aware of nature of conduct or that circumstances exist). Todd acknowledged the January 2021 incident, which undisputedly involved damage to Garza's property and had frightened Garza, and a court ordered her not to contact Garza after the incident. Garza never spoke with Todd after the January 2021 incident, did not solicit any relationship with Todd, and did not reciprocate Todd's efforts at reconciliation. When Todd created an occasion to be in the presence of Garza and Garza's children by attending their church, Garza manifested her fear of Todd by leaving the church with her children. *See Ploeger v. State*, 189 S.W.3d 799, 809 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (considering stalking complainant's manifestation of fear as evidence that defendant knew or reasonably should have believed victim would regard actions as threatening bodily injury or

20

death). When Todd delivered her apology letter to Garza's home, she did so when Garza was not there because she knew it might upset Garza. Additionally, Garza wrote to Todd in May 2023 and asked Todd to leave her alone and stop harassing her; yet in July 2023, Todd contacted Garza's employer to speak poorly of Garza. *See, e.g.*, *Bevers*, 2024 WL 469550, at *9 ("A person's decision to ignore the requests of another person . . . to stop the conduct can reveal his knowledge about his conduct."); *Hoover v. Guillory*, No. 03-21-00421-CV, 2022 WL 3903124, at *4 (Tex. App.—Austin Aug. 31, 2022, no pet.) (mem. op.) (considering applicant's testimony that she told person against whom protective order was granted not to contact her, but he continued to do so for more than a year).

There is also ample evidence in the record that Todd's conduct caused Garza to worry that Todd might harm her, her children, or her property and to feel harassed, annoyed, alarmed, tormented, embarrassed, or offended. Garza testified that she was diagnosed with PTSD because of the January 2021 incident. And she testified repeatedly that even though Todd had not physically harmed her in the January 2021 incident, she worried Todd might do so in the future or damage her property, that she felt harassed by Todd's intrusions around her home, church, and workplace, and that Todd's communications with the school embarrassed her. *See Ploeger*, 189 S.W.3d at 810 (stating stalking complainant's testimony that she feared appellant would harm her supported jury's findings). From the evidence that Todd intruded

at Garza's old job, yelled for Garza, and damaged Garza's car when she did not find Garza; repeatedly ignored Garza's efforts to avoid or cease contact; touched Garza's son without consent; entered Garza's home without Garza's permission; and interfered with Garza's workplace and reputation at the school, the trial court could find that a reasonable person would share Garza's feelings about Todd's conduct.

Viewing the evidence under the applicable standards of review, we conclude the trial court had reasonable grounds to believe that Todd, on more than one occasion and pursuant to the same scheme or course of conduct that was directed specifically at Garza, knowingly engaged in conduct that caused Garza to fear bodily injury or that an offense would be committed against her property, or to feel harassed, annoyed, alarmed, tormented, embarrassed, or offended. See TEX. CODE CRIM. PROC. art. 7B.003; TEX. PENAL CODE § 42.072; *see also Dessens v. Argeroplos*, 658 S.W.3d 438, 446–47 (Tex. App.—Houston [14th Dist.] 2022, no pet.); *Shoemaker*, 493 S.W.3d at 718–19. Accordingly, the evidence was legally and factually sufficient to support the trial court's finding that Garza was a victim of stalking so as to authorize the granting of a protective order against Todd under Chapter 7B, Subchapter A of the Code of Criminal Procedure. *See* TEX. CODE CRIM. PROC. arts. 7B.003(b), 7B.007(a); TEX. PENAL CODE § 42.072.

We overrule Todd's issues.[11]

## Conclusion

We affirm the trial court's protective order.


Andrew Johnson
Justice

Panel consists of Justices Guerra, Guiney, and Johnson.

---

[11] To the extent Todd complains that the duration of the protective order was too long, we also disagree. Protective orders issued under the Code of Criminal Procedure "may be effective for the duration of the lives of the offender and victim or for any shorter period stated in the order." TEX. CODE CRIM. PROC. art. 7B.007(a). The trial court thus had statutory authority to make the protective order effective for three years, and the same evidence set out above supports the trial court's exercise of that authority.